Case Nos. 25-6214 & 25-6470; 25-6223 & 25-6475; 25-6224 & 25-6465; 25-6229 & 25-6468

United States Court of Appeals
for the Ninth Circuit

| | |
|---|---|
| United States of America,<br><br>    Plaintiff/Appellant/Cross-Appellee,<br><br>v.<br><br>Devonte Devon Jackson,<br><br>    Defendant/Appellee/Cross-Appellant. | D.C. No. 2:25-cr-240-GMN<br>District of Nevada<br><br>**Principal and Response Brief** |
| United States of America,<br><br>    Plaintiff/Appellant/Cross-Appellee,<br><br>v.<br><br>Giann Icob Salazar Del Real,<br><br>    Defendant/Appellee/Cross-Appellant. | D.C. No. 2:25-cr-227-JAD<br>District of Nevada |

United States of America,

    Plaintiff/Appellant/Cross-
    Appellee,

v.

Jorge Enriquez, Jr.,

    Defendant/Appellee/Cross-
    Appellant.

D.C. No. 3:25-cr-26-MMD
District of Nevada

United States of America,

    Plaintiff/Appellant/Cross-
    Appellee,

v.

Shamar Tyrell Garcia,

    Defendant/Appellee/Cross-
    Appellant.

D.C. No. 2:25-cr-230-RFB
District of Nevada

Rene L. Valladares
Federal Public Defender
Jeremy C. Baron
Sean A. McClelland
Assistant Federal Public Defenders
411 E. Bonneville Ave. Suite 250
Las Vegas, NV 89101
(702) 388-6577
jeremy_baron@fd.org
sean_mcclelland@fd.org

Counsel for Defendants/Appellees/Cross-Appellants

# Table of Contents

Table of Contents ................................................................................. i

Table of Authorities ......................................................................... iv

Introduction ...................................................................................... 1

Jurisdictional Statement ................................................................... 3

Detention Status ................................................................................ 3

Issues Presented ................................................................................ 4

Legal Background .............................................................................. 4

Statement of the Case ....................................................................... 6

I.     The administration unlawfully attempts to install
       Sigal Chattah as the acting U.S. Attorney. ................................... 6

II.    The administration has repeatedly pursued similar tactics in
       other districts. ............................................................................ 9

Summary of the Argument ............................................................... 14

Argument .......................................................................................... 17

I.     Ms. Chattah is ineligible to serve as acting U.S. Attorney
       under Section 3345(a)(1). ............................................................ 17

       A.    The statute does not permit the administration to
             backfill a first assistant. ...................................................... 17

             1.     The statutory text and structure support this
                    conclusion. ................................................................ 17

                    a)     The provision operates automatically when
                           the vacancy occurs. ........................................ 18

b)     The government's reading creates a major surplusage problem. ............................................ 22

c)     The government's textual and structural arguments are wrong............................................ 26

2.     Legislative history and Congressional purpose support this conclusion. ............................................... 29

3.     Case law uniformly supports this conclusion. ............. 33

4.     The government erroneously relies on a purported longstanding practice................................................. 34

B.     Even if Ms. Chattah could serve as acting U.S. Attorney, her time has expired. ........................................................... 38

1.     Her time expired on July 25, 2025, under Section 546(c)(2). ................................................................... 38

2.     Her time expired under Section 3346 on November 16. ................................................................ 42

II.     The administration cannot rely on general delegation authority to create a de facto acting officer. ................................. 42

A.     The government's theory is wrong. ...................................... 44

1.     Text and case law resolve the issue. ........................... 44

a)     Section 3347 and *Gonzales* foreclose the government's argument........................................ 44

b)     The government's analysis is incorrect. ............. 46

2.     The theory is irreconcilable with legislative history and Congressional purpose. ......................................... 54

3.     The government erroneously relies on a purported Executive Branch practice............................................ 56

B.    The government's theory would violate the Appointments Clause. ........................................... 58

    1.    Indefinitely serving "temporary" U.S. Attorneys are principal officers. ................................. 59

        a)    U.S. Attorneys are principal officers. ................ 59

        b)    Indefinitely serving "temporary" appointees warrant the same treatment. ............................ 64

    2.    Even if U.S. Attorneys are inferior officers, there is still an Appointments Clause problem .................... 66

    3.    A de facto acting officer is not a temporary officer ...... 70

C.    Even if the government's theory is correct in general, there are case-specific problems. ........................... 71

    1.    There is no authority to appoint a special attorney to serve as a de facto U.S. Attorney. ........................... 71

    2.    The Attorney General did not properly delegate the authority. ............................................. 73

D.    Assuming Ms. Chattah is a special attorney and a first assistant, she still cannot lead the office. ........................... 74

III.    The district court erroneously failed to dismiss the indictments. 78

A.    Standard of review ................................................. 78

B.    Dismissal is appropriate under the statutory framework. ... 79

C.    Dismissal is appropriate under *Bundy*. ............................... 83

D.    Dismissal is appropriate under *Lucia*. .................................. 88

Conclusion ........................................................................ 90

iii

# Table of Authorities

## Cases

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
35 F.4th 1328 (Fed. Cir. 2022) ........................................................ 52

*Azar v. Allina Health Servs.*, 587 U.S. 566 (2019) ................................ 22

*Bond v. United States*, 572 U.S. 844 (2014) ......................................... 41

*Boudette v. Barnette*, 923 F.2d 754 (9th Cir. 1991) ............................. 40

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................. 87

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) ............................................................. 49, 50

*Collins v. Yellen*, 594 U.S. 220 (2021) .................................................. 89

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) .................................... 37

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*,
139 F.3d 203 (D.C. Cir. 1998) ........................................................... 5

*Edmond v. United States*, 520 U.S. 651 (1997) .............................. 60, 61

*Erikson v. Pawnee Cnty. Bd. Of Cnty. Com'rs*,
263 F.3d 1151 (10th Cir. 2001) ................................................. 84, 85

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064 (9th Cir. 2024) ....................... *passim*

*Gonzalez v. Herrera*, 151 F.4th 1076 (9th Cir. 2025) .................... 32, 54

*Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*,
531 F.3d 767 (9th Cir. 2008) ........................................................... 28

*Hooks v. Kitsap Tenant Support Services, Inc.*,
816 F.3d 550 (9th Cir. 2016) ................................................. *passim*

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) ........................ 17

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
684 F.3d 1332 (D.C. Cir. 2012) .................................................. 62

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) .................................. 66, 70

*Jooce v. FDA*, 981 F.3d 26 (D.C. Cir. 2020) .......................................... 5

*Kajmowicz v. Whitaker*, 42 F.4th 138 (3d Cir. 2022) ..................... 48, 51

*Kisor v. Wilkie*, 588 U.S. 558 (2019) .............................................. 35, 36

*L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020) ................ *passim*

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ............... 35

*Lucia v. SEC*, 585 U.S. 237 (2018) ................................................. 16, 88

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc) ................... 64

*Morrison v. Olson*, 487 U.S. 654 (1988) ............................................. 60

*Murphy Co. v. Biden*, 65 F.4th 1122 (9th Cir. 2023) ....................... 29, 54

*Myers v. United States*, 272 U.S. 52 (1926) ........................ 60, 67, 68, 70

*N.L.R.B. v. SW General, Inc.*, 580 U.S. 288 (2017) ...................... *passim*

*Nadler v. Mann*, 951 F.2d 301 (11th Cir. 1992) .................................. 61

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ................................................................... 39, 40

*Rop v. Fed. Hous. Fin. Agency*, 50 F.4th 562 (6th Cir. 2022) ......... 64, 65

*Schaghticoke Tribal Nation v. Kempthorne*,
587 F.3d 132 (2d Cir. 2009) (per curiam) ......................................... 53

*Stand Up for California! v. United States Dep't of the Interior*,
994 F.3d 616 (D.C. Cir. 2021) ................................................... 53, 54

*Stein v. Kaiser Found. Health Plan, Inc.*,
115 F.4th 1244 (9th Cir. 2024) (en banc) .................................... 82, 83

*SW General, Inc. v. N.L.R.B.*, 796 F.3d 67 (D.C. Cir. 2015) ..... 32, 34, 57

v

*Trump v. United States*, 603 U.S. 593 (2024) ............................ *passim*

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ......................... 14, 22, 23, 40

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ............... 59, 62, 63, 70

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) ............... *passim*

*United States v. Eaton*, 169 U.S. 331 (1898) ...................... 59, 64, 65, 70

*United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999) .................... 63, 82

*United States v. Giraud*, __ F. Supp. 3d __,
 2025 WL 2416737 (D.N.J. Aug. 21, 2025) ............................... *passim*

*United States v. Hawthorne*,
 626 F.2d 87 (9th Cir. 1980) (per curiam) ......................................... 73

*United States v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823)................ 68

*United States v. Perkins*, 116 U.S. 483 (1886) ...................................... 67

*United States v. Plesinski*, 912 F.2d 1033 (9th Cir. 1990) ................... 73

*United States v. Ramirez*, __ F. Supp. 3d __,
 2025 WL 3019248 (C.D. Cal. Oct. 28, 2025) ............................ *passim*

*United States v. Trump*, 740 F. Supp. 3d 1245 (S.D. Fla. 2024) .. *passim*

*Weiss v. United States*, 510 U.S. 163 (1994) ........................................ 69

*Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457 (2001) ...... 27

*Williams v. Phillips*, 360 F. Supp. 1363 (D.D.C. 1973) ........................ 34

*Wilson v. Comm'r*, 705 F.3d 980 (9th Cir. 2013) ................................. 17

*Young v. United States ex rel. Vuitton et Fils S.A.*,
 481 U.S. 787 (1987) ......................................................................... 85

**Constitutional Provisions, Statutes, and Regulations**

U.S. Const. art. II, § 2, cl. 2 ....................................................58, 59, 67

5 U.S.C. § 3345 ............................................................................. *passim*

5 U.S.C. § 3346 ........................................................ 15, 21, 42

5 U.S.C. § 3347 ...................................................... *passim*

5 U.S.C. § 3348 ...................................................... *passim*

5 U.S.C. § 3349 ............................................................... 29

5 U.S.C. § 3349a ............................................................. 42

18 U.S.C. § 208 ............................................................... 85

18 U.S.C. § 3231 ............................................................... 3

28 U.S.C. § 509 ............................................................... 43

28 U.S.C. § 510 ............................................... 43, 45, 73, 74

28 U.S.C. § 515 ................................................... 72, 73, 74

28 U.S.C. § 541 ................................................. 4, 60, 61, 77

28 U.S.C. § 543 ............................................................... 72

28 U.S.C. § 546 ...................................................... *passim*

28 U.S.C. § 547 ........................................................ 61, 79

Act of Mar. 3, 1863, ch. 93, § 2, 12 Stat. 768 (1863)................ 40

28 C.F.R. § 0.137 ............................................................ 76

## Other

23 Op. O.L.C. 60 (1999) .............................................. 35, 57

25 Op. O.L.C. 177 (2001) ................................................. 35

Letter from Carlotta C. Joyner, Dir., Strategic Issues, GAO,
to Fred Thompson, Chairman, U.S. Senate Comm. on
Governmental Affairs (Feb. 23, 2001) ............................... 36

Letter from Victor S. Rezendes, Dir., Strategic Issues, GAO,
to U.S. Senators Joseph I. Lieberman and Dan Burton
(Dec. 7, 2001) ............................................................... 36

*Brief for the Petitioner, N.L.R.B. v. SW General, Inc.*
(No. 15-1251), 2016 WL 4363344 (Aug. 12, 2016) ............................ 32

*Learning Resources, Inc., et al. v. Trump* (No. 24-1287),
Oral Argument Tr. (Nov. 5, 2025) ...................................................... 33

144 Cong. Rec. S11037 (daily ed. Sept. 28, 1998) ................................. 30

144 Cong. Rec. S12822 (daily ed. Oct. 21, 1998) ................................... 30

H.R. Rep. No. 110-58, at *4 (2007)......................................................... 40

S. Rep. No. 105-250 (1998) ................................................. 29, 30, 31, 55

U.S. Dep't of Just., Just. Manual................................................... 62, 80

Black's Law Dictionary ....................................................................... 47

Samuel L. Bray, *The Mischief Rule*, 109 Geo. L. J. 967 (2021) ............. 41

Steven J. Duffield & James C. Ho, *The Illegal Appointment
of Bill Lann Lee*, Note, 2 Tex. Rev. L. & Pol. 335, 348-53 (1998) ....... 32

## Introduction

"The Senate's advice and consent power is a critical structural safeguard of the constitutional scheme." *N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 293 (2017) (cleaned up). Congress has historically relaxed that safeguard by granting the administration limited authority to designate acting officers when a vacancy occurs. But in 1998, Congress concluded the Executive Branch was abusing this authority, so it passed the Federal Vacancies Reform Act—and imposed new restrictions—to defuse "a threat to the Senate's advice and consent power." *Id.* at 295.

The government's position ignores those safeguards. It maintains Sigal Chattah is properly serving as acting U.S. Attorney for the District of Nevada, but its legal theories—a faulty acting-officer argument and an overexpansive general delegation claim—are faulty.

First, the government argues Ms. Chattah qualifies as acting U.S. Attorney under 5 U.S.C. § 3345(a)(1). That provision creates a default rule: the person serving as first assistant when the vacancy occurs automatically becomes the acting officer. The government insists it may wait until months *after* the vacancy occurs and then backfill the

1

first assistant role with whomever it likes. This assertion would render the FVRA's restrictions largely meaningless. It is therefore inconsistent with the statutory text, structure, legislative history, and legislative purpose, not to mention the weight of persuasive authority.

Second, the government claims it may create a de facto acting U.S. Attorney by having the Attorney General delegate the relevant responsibilities to anyone she chooses. 5 U.S.C. § 3347 squarely forecloses this theory. *See Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1076-80 (9th Cir. 2024). That is true even if Ms. Chattah has the title "first assistant."

Although the district court properly concluded Ms. Chattah was ineligible to serve as the acting U.S. Attorney, it erred when it declined to dismiss the indictments. Dismissal is required under the statutory scheme. *See Gonzales*, 107 F.4th at 1076-80. Dismissal is also necessary to deter the government from continuing to install improper acting U.S. Attorneys. *See United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020). This Court should affirm the district court's conclusion regarding Ms. Chattah's ineligibility but reverse its remedial decision and remand with instructions to dismiss the indictments.

2

## Jurisdictional Statement

The government brought an interlocutory appeal of the district court's order disqualifying Ms. Chattah. The defense cross-appealed the same order because the district court declined to dismiss the indictments. The district court had jurisdiction under 18 U.S.C. § 3231. It entered its order on September 30, 2025. ER-8-39. The defense filed timely notices of cross-appeal on October 10, 2025. SER-99-106. This Court has jurisdiction over the cross-appeals. *See* Dkt. No. 16.1.

## Detention Status

All the defendants but Mr. Enriquez are incarcerated in pre-trial custody. Mr. Enriquez is at liberty and under supervision. *See* Circuit Rule 27-8.1.

## Issues Presented

I.     Whether the administration may install Ms. Chattah as acting U.S. Attorney under 5 U.S.C. § 3345(a)(1) by backfilling her into the first assistant role.

II.    Whether, notwithstanding 5 U.S.C. § 3347, the administration may install Ms. Chattah as de facto acting U.S. Attorney by delegating the vacant office's responsibilities to her.

III.   Whether the district court erroneously failed to dismiss the indictments, which the government obtained while Ms. Chattah was invalidly leading the U.S. Attorney's office.

## Legal Background

This case involves the interplay between two statutes covering vacancies in the office of U.S. Attorney. That position typically requires Senate confirmation. *See* 28 U.S.C. § 541(a). But when a vacancy occurs, the administration can fill it temporarily without seeking Senate approval.

The first method is 5 U.S.C. § 3345, which covers vacancies in Executive Branch positions requiring Senate confirmation ("PAS

4

offices").[1]  Section 3345(a) imposes strict eligibility requirements for who may serve.  But the statutory scheme provides a long timeframe: the acting officer may serve for 210 days, potentially more.

The second method is 28 U.S.C. § 546, which covers U.S. Attorney vacancies.  Section 546 imposes minimal restrictions on who can serve as interim U.S. Attorney.  In that respect, the statute provides more flexibility than Section 3345.  But the interim U.S. Attorney may serve for only 120 days.  28 U.S.C. § 546(c)(2).  In that respect, the statute provides less flexibility.  After 120 days, the relevant district court judges may select an interim U.S. Attorney to serve until the Senate confirms a permanent replacement.  28 U.S.C. § 546(d).

---

[1] A qualifying vacancy occurs when a Senate-confirmed permanent officer leaves—not when a temporary officer leaves.  *See, e.g.*, *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 208 (D.C. Cir. 1998) ("[T]he person whose 'vacancy' brings the [statute] into operation must have ascended to the post through a Presidential appointment.") (interpreting the pre-1998 version), *superseded by statute on other grounds as recognized in Jooce v. FDA*, 981 F.3d 26, 28 (D.C. Cir. 2020).

## Statement of the Case

### I. The administration unlawfully attempts to install Sigal Chattah as the acting U.S. Attorney.

Jason Frierson was the last Senate-confirmed U.S. Attorney for the District of Nevada. ER-8. He resigned on January 17, 2025. ER-8. The first assistant U.S. Attorney, Sue Fahami, became the acting U.S. Attorney under 5 U.S.C. § 3345(a)(1). ER-9.

The administration appointed Sigal Chattah as interim U.S. Attorney under 28 U.S.C. § 546 on March 27, 2025 (effective April 1). ER-183. On July 28—the day before it thought the 120-day period would expire—the administration took five "procedural steps" to attempt to assign Ms. Chattah as acting U.S. Attorney. ER-9. The administration (1) had her resign as interim U.S. Attorney (although her resignation letter stated she would continue to lead the office); (2) purported to hire her as a special attorney in the Department of Justice; (3) designated her first assistant U.S. Attorney effective upon her resignation as interim U.S. Attorney; (4) asserted she would thereby become the acting U.S. Attorney; and (5) vacated the first assistant position by promoting Ms. Fahami. ER-9. "These steps purported to

6

foreclose the statutory power of the judges in the District of Nevada to appoint an interim U.S. Attorney at the end of Ms. Chattah's 120-day term." ER-10.

The government obtained indictments against the four defendants at issue in these consolidated appeals after July 28. In each case, the defense filed a materially equivalent motion challenging Ms. Chattah's status. The defense asked the district court to dismiss the indictments because the government obtained them while Ms. Chattah was improperly serving as acting U.S. Attorney. Alternatively, the motions asked the district court to disqualify Ms. Chattah from supervising the prosecutions. This Court's chief judge assigned an out-of-district judge (Senior Judge David G. Campbell, District of Arizona) to resolve the motions.

The district court entered an order on September 30, 2025, resolving the motions. ER-8-39. The court agreed Ms. Chattah was ineligible to serve as acting U.S. Attorney. The government asserted she was eligible under 5 U.S.C. § 3345(a)(1). That statute provides a default rule: the person serving as first assistant when the vacancy occurs automatically becomes the acting officer. The government

7

argued it can use the statute to place anyone it likes into the acting officer role by designating a new first assistant "months after the vacancy occurs." ER-14. The district court correctly rejected the argument: the provision "operates only on first assistants in place when vacancies begin." ER-23. Ms. Chattah was not the first assistant when Mr. Frierson resigned on January 17, so she was ineligible under Section 3345(a)(1).

The government further asserted the Attorney General could make Ms. Chattah a de facto acting U.S. Attorney—potentially in perpetuity—by delegating every power of the vacant U.S. Attorney position to her. As the district court rightly determined, this theory "runs headlong into" 5 U.S.C. § 3347, which prohibits this specific practice. ER-27.

The district court granted the defense's request to disqualify Ms. Chattah but denied the request to dismiss the indictments. ER-39. The government appealed the district court's order because it required disqualification. The defense cross-appealed the order because it declined to dismiss the indictments.

8

At the government's request, the district court entered a stay. The court explained it "stands by its previous ruling" on the merits. ER-5. "The government has not shown it is likely to prevail on its challenge to [the court's] conclusions." ER-5. "[T]he Court is fully persuaded that its decision is correct as a matter of law." ER-6. "The Court still holds that Ms. Chattah has not been validly appointed." ER-6. It nevertheless granted a stay out of a "spirit of solicitude" toward the Executive Branch. ER-7.

## II. The administration has repeatedly pursued similar tactics in other districts.

The administration's improper approach in Nevada—appointing an interim U.S. Attorney, then attempting to convert the individual to acting U.S. Attorney shortly before the anticipated expiration of the 120-day period under Section 546(c)(2)—is a tactic the administration has used in multiple districts.

In the District of New Jersey, Philip Sellinger was the last Senate-confirmed U.S. Attorney. After he resigned, the administration eventually appointed Alina Habba as interim U.S. Attorney. *See United States v. Giraud*, __ F. Supp. 3d __, 2025 WL 2416737, at *2 (D.N.J.

9

Aug. 21, 2025). Shortly before the administration thought her Section 546 appointment would expire, it pursued the same "multi-step maneuver" as it did with Ms. Chattah. *Id.* at *3. Two sets of defendants challenged Ms. Habba's status as acting U.S. Attorney. The government defended her status with the same two theories it presents here. The district court rejected those theories and disqualified Ms. Habba. *Id.* at *30. The government appealed. The Third Circuit has held oral argument (Case Nos. 25-2635 & 25-2636); the case is submitted for decision.

In the Central District of California, Martin Estrada was the last Senate-confirmed U.S. Attorney. After he resigned, the administration eventually appointed Bill Essayli as interim U.S. Attorney. *See United States v. Ramirez*, __ F. Supp. 3d __, 2025 WL 3019248, at *2 (C.D. Cal. Oct. 28, 2025). Shortly before the administration thought his Section 546 appointment would expire, it pursued the same multi-step maneuver as it did with Ms. Chattah. Various sets of defendants challenged Mr. Essayli's status as acting U.S. Attorney. The government defended his status with the same two theories it presents here. The district court rejected those theories and disqualified

10

Mr. Essayli as acting U.S. Attorney. *Id.* at \*18. However, it concluded he could supervise prosecutions in his capacity as first assistant U.S. Attorney. *Id.* at \*18-\*20. Certain defendants filed a motion for reconsideration regarding this remedial portion of the opinion. The motion will be fully briefed as of December 5, 2025; no party has appealed.

In the District of New Mexico, Alexander Uballez was the last Senate-confirmed U.S. Attorney. After he resigned, the administration eventually appointed Ryan Ellison as interim U.S. Attorney. Shortly before the administration thought his Section 546 appointment would expire, it pursued the same multi-step maneuver as it did with Ms. Chattah. Various sets of defendants challenged Mr. Ellison's status as acting U.S. Attorney. *See, e.g., United States v. Garcia*, Case No. 1:25-cr-3549-JB, ECF No. 16 (D.N.M. Sept. 12, 2025). The government defended his status with the same two theories it presents here. *See, e.g., United States v. Garcia*, Case No. 1:25-cr-3549-JB, ECF No. 35 (D.N.M. Oct. 14, 2025). The district court requested supplemental briefing, with the final briefs due December 19, 2025.

11

In the Northern District of New York, Carla Freedman was the last Senate-confirmed U.S. Attorney. After she resigned, the administration eventually appointed John Sarcone as interim U.S. Attorney. Around the time his Section 546 appointment expired, the administration pursued the same multi-step maneuver as it did with Ms. Chattah. The New York State Attorney General's office filed a motion to quash certain federal grand jury subpoenas and challenged Mr. Sarcone's status as acting U.S. Attorney. *In re Grand Jury Subpoenas*, Case No. 1:25-mc-19-LGS, ECF No. 1-2 at 39-42 (N.D.N.Y. Aug. 19, 2025).[2] The government defended his status with theories that are similar to the theories it presents here. *In re Grand Jury Subpoenas*, Case No. 1:25-mc-19-LGS, ECF No. 45 at 27-39 (N.D.N.Y. Nov. 3, 2025). The motion is fully briefed with oral argument scheduled December 4, 2025.

In the Eastern District of Virginia, Jessica Aber was the last Senate-confirmed U.S. Attorney. After she resigned, the administration appointed Erik Seibert as interim U.S. Attorney. When the 120-day

---

[2] Pin citations to documents filed in this case refer to the page numbers generated by CM/ECF in the header.

12

period expired, the judges of the district exercised their Section 546(d) authority to extend Mr. Seibert's appointment. Mr. Seibert resigned, and the administration purported to name Lindsey Halligan as interim U.S. Attorney. Ms. Halligan secured indictments against James Comey and Letitia James. Mr. Comey and Ms. James challenged Ms. Halligan's status as interim U.S. Attorney. *See United States v. Comey*, Case No. 1:25-cr-272-MSN, ECF No. 60 (E.D. Va. Oct. 20, 2025); *United States v. James*, Case No. 2:25-cr-122-JKW, ECF No. 22 (E.D. Va. Oct. 24, 2025). The government defended her authority in part by retroactively invoking a theory similar to one of the two theories at issue here. *See United States v. Comey*, Case No. 1:25-cr-272-MSN, ECF Nos. 137, 137-1 (E.D. Va. Nov. 3, 2025) (consolidated response). The motion is fully briefed; the case is pending decision with a ruling anticipated soon.

13

## Summary of the Argument

I.A.   Ms. Chattah cannot serve as acting U.S. Attorney under 5 U.S.C. § 3345(a)(1).  Under that statute, when a vacancy occurs in an Executive Branch position that requires Senate confirmation (like the office of U.S. Attorney), the person serving as first assistant at the time of the vacancy becomes the acting officer.  The statute does not allow the administration to wait until months after the vacancy, backfill the first assistant role with anyone it likes, and thereby designate anyone to be acting officer.

Subsection (a)(1) is an "automatic[]" default rule.  *Hooks v. Kitsap Tenant Support Services, Inc.*, 816 F.3d 550, 557 (9th Cir. 2016).  By contrast, (a)(2) and (a)(3) give the President authority to override the default rule and select another acting officer from a limited set of eligible individuals.  If the government could backfill anyone into the first assistant role, (a)(2) and (a)(3) would become largely "superfluous." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).  Were there any doubt, legislative history and purpose dispel the government's interpretation.  To date, no court has adopted the government's argument.  This Court should reject it.

14

I.B. Even if Ms. Chattah were initially eligible to serve as acting U.S. Attorney, her time has run out. When an individual serves as interim U.S. Attorney under 28 U.S.C. § 546, the person may temporarily carry out the duties of the vacant office, but only for 120 days. The 120-day limit applies even if the administration switches the person's designation from interim to acting U.S. Attorney under 5 U.S.C. § 3345. Ms. Chattah's term as temporary U.S. Attorney therefore expired on July 25, 2025, before the government secured the indictments at issue in these appeals. In the alternative, assuming 5 U.S.C. § 3346 provides the governing time limit, her term expired on November 16.

II. The government's general delegation theory is incorrect. According to the government, it may designate anyone it likes as de facto acting U.S. Attorney by having the Attorney General delegate all the responsibilities of the vacant U.S. Attorney position to anyone employed within the Department of Justice. Under this theory, the administration could fire every U.S. Attorney across the country and create 91 de facto acting U.S. Attorneys—all of whom could serve indefinitely—without ever seeking Senate confirmation. Congress

15

passed the FVRA to prevent this very tactic. *See Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1078 n.7 (9th Cir. 2024). The government's contrary argument relies on semantic games. Its position would create serious Appointments Clause concerns. And its fallback argument—that Ms. Chattah can continue to supervise the office as first assistant U.S. Attorney—fares no better. The district court correctly rejected this theory.

III. Because the government secured these indictments while Ms. Chattah was invalidly leading the office, the district court should have dismissed the indictments. The statutory regime requires dismissal because Ms. Chattah's actions are void or voidable. *See Gonzales*, 107 F.4th at 1077-78. Dismissal would provide appropriate deterrence. *See United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020). And dismissal would accord with *Lucia v. SEC*, 585 U.S. 237 (2018). *See United States v. Trump*, 740 F. Supp. 3d 1245 (S.D. Fla. 2024). The Court should affirm the district court's ineligibility determination but reverse its remedial conclusion and remand with instructions to dismiss the indictments.

16

## Argument

### I. Ms. Chattah is ineligible to serve as acting U.S. Attorney under Section 3345(a)(1).

Because Ms. Chattah was not the first assistant U.S. Attorney when Mr. Frierson resigned on January 17, she is not eligible to serve as acting U.S. Attorney under 5 U.S.C. § 3345(a)(1). Even if she were, her time has expired.

#### A. The statute does not permit the administration to backfill a first assistant.

The district court correctly concluded Section 3345(a)(1) "operates only on first assistants in place when vacancies begin." ER-23. Every relevant consideration supports this conclusion: statutory text and structure, legislative history and purpose, and case law. The government's arguments are unpersuasive.

##### 1. The statutory text and structure support this conclusion.

When conducting statutory interpretation, courts start with text and structure. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *Wilson v. Comm'r*, 705 F.3d 980, 987 (9th Cir. 2013). The FVRA's text and structure support the district court's reading.

17

### a) The provision operates automatically when the vacancy occurs.

The FVRA provides three methods for designating an acting officer. The district court's interpretation respects the differences between those methods.

Under subsection (a)(1), when a Senate-confirmed officer departs, "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." This provision "fills the role automatically." *Hooks v. Kitsap Tenant Support Services, Inc.*, 816 F.3d 550, 557 (9th Cir. 2016); *see also N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 295 (2017) (calling subsection (a)(1) "a general rule").

Under subsections (a)(2) and (a)(3), "notwithstanding" subsection (a)(1), "the President (and only the President) may" eventually designate a different person as acting officer. Under (a)(2), the President may select someone who received "the advice and consent of the Senate" for another Executive Branch role. Under (a)(3), the President may select a senior career official who (A) worked in the agency at least 90 days in the 365 days preceding the vacancy and (B)

18

received a sufficiently high rate of pay. These subsections "provide two ways the President may override the automatic operation of (a)(1)." *Hooks*, 816 F.3d at 557.

These are categorically different methods for filling the vacancy. Subsection (a)(1) is mandatory and automatic. It triggers immediately when the vacancy occurs and "provides no room for Executive Branch involvement." ER-17. Subsections (a)(2) and (a)(3) are discretionary. They apply after the vacancy occurs, if and only if "the President" elects to make a "designation." ER-16 (cleaned up). Thus, unlike (a)(2) and (a)(3), which authorize post-vacancy selections, "subsection (a)(1) operates only on first assistants in place when vacancies begin." ER-23; *see also United States v. Ramirez*, __ F. Supp. 3d __, 2025 WL 3019248, at *5-*6 (C.D. Cal. Oct. 28, 2025) (similar); *United States v. Giraud*, __ F. Supp. 3d __, 2025 WL 2416737, at *15 (D.N.J. Aug. 21, 2025) (similar).

The government nevertheless maintains the administration may backfill the first assistant position months after the vacancy with anyone it likes and thereby designate anyone as acting officer under subsection (a)(1). It insists its interpretation respects the automatic

19

nature of subsection (a)(1) "because a vacancy is a continuing state of affairs," so "whoever is serving as the first assistant at a particular moment in time during the vacancy becomes the acting official." Principal Brief ("PB")-23.[3]

This argument ignores the textual differences between the three subsections. "[S]ubsection (a)(1) is an automatic mechanism . . . to fill the vacancy with no Executive Branch involvement." ER-21; *see also Ramirez*, 2025 WL 3019248, at *5 (similar); *Giraud*, 2025 WL 2416737, at *15 (similar). By contrast, "Congress did choose to give the President a role in filling vacancies . . . in subsections (a)(2) and (a)(3)." ER-21; *see also Ramirez*, 2025 WL 3019248, at *5-*6 (similar); *Giraud*, 2025 WL 2416737, at *15 (similar). The government erroneously treats the three subsections as being "on equal footing" in allowing Executive Branch discretion. *Ramirez*, 2025 WL 3019248, at *5. To the contrary,

---

[3] Pin citations to this brief refer to the page numbers in the footer.

"one is a self-executing default rule while the other two are discretionary alternatives." *Id.*[4]

The government's argument also ignores the assignment of responsibilities. If the administration wants to make a post-vacancy selection, "'the President must take personal responsibility for the designation.'" ER-16 (quoting *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 26, 28 (D.D.C. 2020)). But according to the government, the Attorney General—not the President—may select anyone to serve as acting U.S. Attorney by backfilling the first assistant role. This position fails to respect Congress's judgment that the President (and only the President) may exercise discretion.

The government asserts its contrary position is good policy because it would be burdensome for the President "to personally fill every PAS vacancy that arises." PB-24. The President need not do so;

---

[4] As other portions of the text show, the statute usually treats a "vacancy" as occurring at a particular point in time. *See* 5 U.S.C. §§ 3346(a) & (a)(1), 3346(c), 3348(a)(2)(B)(ii), 3349(b) & (b)(1). Section 3345 uses the term "vacant office" to refer to an ongoing condition, but only in subsections (a)(2) and (a)(3), which the President will typically invoke only after the vacancy occurs and (a)(1) is triggered. *See Ramirez*, 2025 WL 3019248, at *7.

21

the first assistant at the time of the vacancy automatically fills the vacancy. Even if it would be good policy to allow other officials to make post-vacancy selections, that "policy argument" is a matter for Congress, not the courts, "as the government knows well." *Azar v. Allina Health Servs.*, 587 U.S. 566, 581 (2019). The district court's interpretation respects the statutory text.

### b) The government's reading creates a major surplusage problem.

If the administration may backfill first assistants, subsections (a)(2) and (a)(3) become largely superfluous. The Court should avoid that problem and reject the government's position.

"It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (cleaned up). A surplusage problem exists if (for instance) "a proviso accounting for more than half of [the] text would lie dormant in all but the most unlikely situations." *Id.*; *see also id.* at 29 ("all but the most unusual circumstances"); *id.* at

22

31 ("rare and egregious cases") (cleaned up); *id.* ("'vast majority'") (quoting an amicus brief in a parenthetical).

The government's backfilling theory violates this principle. If the government is correct that it may backfill a first assistant to designate an acting officer under subsection (a)(1), then the President would almost never need to rely on (a)(2) or (a)(3) to make a post-vacancy designation. Rather, the administration could simply use (a)(1) to name anyone first assistant and thus the acting officer. But Congress imposed stringent eligibility requirements in (a)(2) and (a)(3) to "control[] who could be appointed." ER-22. Under (a)(2), the person must be Senate-confirmed already; under (a)(3), the person must be a senior career official. "There would be no need to satisfy the rigorous requirements of subsections (a)(2) and (a)(3) if the easy path followed by the government in this case was available." ER-16. This is a substantial surplusage problem. ER-16; *see also Ramirez*, 2025 WL 3019248, at *6 (similar); *Giraud*, 2025 WL 2416737, at *15 (similar); *cf. SW General*, 580 U.S. at 294 (explaining the earliest version of the statute allowed the President to fill certain vacancies with "any person or persons").

23

The government fails to rebut this conclusion. First, the government insists its interpretation leaves room for subsections (a)(2) and (a)(3) when the first assistant role itself requires Senate confirmation; in that event, the administration cannot unilaterally backfill the first assistant role. PB-24. But this situation "seems likely to be rare." ER-17; *see also Ramirez*, 2025 WL 3019248, at *6 (similar); *Giraud*, 2025 WL 2416737, at *16 (similar). In the district court, the defense provided an illustrative calculation of precisely how rare: Main Justice contains about three officers whose first assistants require Senate confirmation, but there are hundreds of officers within the Department of Justice whose first assistants do not. SER-15-16. The government has not disputed that calculation. Indeed, it says about 1,000 Executive Branch offices require Senate confirmation, but it provides only two examples of offices whose first assistants likewise require Senate confirmation. PB-24-25. This is a heartland surplusage issue.

Second, the government suggests subsections (a)(2) and (a)(3) are not superfluous if the office of the agency head is vacant and the first assistant must be appointed by the agency head, or if the

24

administration wants to leave the current first assistant in place yet assign a new acting officer. It complains "[t]he district court did not address [these] circumstances." PB-25. But the government failed to present the first hypothetical until its stay motion, and it failed to present the second hypothetical at all below. Regardless, they add little to the analysis. The government provides only two examples of a first assistant role that must be designated by the agency head. PB-25. This situation will therefore be rare. It will likewise be rare for the administration to want the existing first assistant to remain the first assistant, while simultaneously wanting someone else to occupy the acting officer role. In that hypothetical, the administration could still get to a similar result through (a)(1) by moving the existing first assistant to a similar role in the agency then backfilling the first assistant role under (a)(1)—just as it did with Ms. Fahami in this very case.

Third, the government argues subsections (a)(2) and (a)(3) are not superfluous because the President has relied on those subsections in the past. PB-26 (identifying 28 uses of (a)(2) or (a)(3) this year; four standing orders regarding acting agency head positions; and six Office

25

of Legal Counsel opinions). But the surplusage analysis does not depend on whether the President has ever invoked (a)(2) or (a)(3). Rather, there are two key questions. The first is whether, for those examples, the administration could have used (a)(1) to accomplish the same result—i.e., whether the examples reflect situations where (a)(1) could not have applied. After all, if the administration could rely on either (a)(1), (a)(2), or (a)(3) to name someone the acting officer, it makes little difference which provision it cites. The second key question is, assuming there are situations where the administration can proceed only under (a)(2) and (a)(3), whether those situations are relatively rare compared to situations where the administration could proceed under (a)(1). The government does not answer those questions, so it cannot avoid a surplusage problem.

> **c)** **The government's textual and structural arguments are wrong.**

The government relies on three textual or statutory arguments; each miss the mark.

First, the government observes subsection (a)(1) refers to "the first assistant to the office of [the departed] officer," as opposed to (for

26

example) "the first assistant to [the departed] officer. *See* PB-18-19.

The government overreads "this small variation in wording." ER-21.

The text is technically accurate, because after the vacancy occurs, the

first assistant is the first assistant to the vacant office, not to the

departed officer. *See Giraud*, 2025 WL 2416737, at \*16. The language

also reinforces that "first assistant" is a term of art referring to a

specific position as opposed to a reference to "a personal assistant" like

an administrative assistant or the next-senior-most individual in the

office. ER-21; *contra* PB-29 (misunderstanding this point). "[T]his

wording choice [cannot] be reasonably viewed as evidence that Congress

intended to grant the Attorney General broad power to choose

whomever she wants whenever she wants." ER-21; *see also Ramirez*,

2025 WL 3019248, at \*8 (similar); *Giraud*, 2025 WL 2416737, at \*16

(similar); *cf. Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457,

468 (2001) ("Congress . . . does not, one might say, hide elephants in

mouseholes").

Second, the government relies on the statute's present tense. PB-18-19. But "[t]he present tense does more to support [the defense's] reading than the government's." ER-18. When the vacancy occurs, two

27

things happen presently: the existing first assistant automatically fills the acting position, and the President obtains authority to make a post-vacancy designation. Subsection (a)(1) therefore requires the individual to be the first assistant, in the present tense, when the vacancy occurs. *See Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 775 (9th Cir. 2008) (explaining a statute's "use of the present tense in defining 'Indian lands' unambiguously [requires] . . . the real estate must *already* be held by the United States"); *see also Ramirez*, 2025 WL 3019248, at \*7 (explaining the government "confuses the present tense with the present-perfect"); *Giraud*, 2025 WL 2416737, at \*14 n.159 (similar).

Third, the government cites subsections (a)(3)(A) and (b)(1)(A). PB-19-20; PB-27-28. Under (a)(3)(A), the President may select as acting officer a senior career official who worked at the agency at least 90 days in the year preceding the vacancy. Under (b)(1)(A), a nominee for the permanent position may not serve as acting officer under (a)(1), (a)(2), or (a)(3), unless the nominee was the first assistant for at least 90 days in the year preceding the vacancy. The government asserts there is "[n]o such backward-looking eligibility requirement" under (a)(1). PB-

28

20.  True, (a)(1) does not impose a 90-day backward-looking eligibility requirement:  a first assistant may become the acting officer when the vacancy occurs even if the first assistant has held the role less than 90 days.  But the statute has a present-tense eligibility requirement:  the first assistant must be serving in the role, presently, when the vacancy occurs.  "[T]he presence of backward-looking language in [other] subsections . . . actually supports [the defense's] reading."  ER-19; *see also Ramirez*, 2025 WL 3019248, at *8-*9 (rejecting the government's argument); *Giraud*, 2025 WL 2416737, at *16 n.175 (same).

### 2. Legislative history and Congressional purpose support this conclusion.

The statutory text is clear on its own, but if a resort to legislative history is necessary, it "confirms [the district court's] reading of the statute's plain language."  *Murphy Co. v. Biden*, 65 F.4th 1122, 1135 (9th Cir. 2023).

A Senate committee prepared the original version of the bill and provided a report.  S. Rep. No. 105-250 (1998).  That report explains the committee designed the statute to automatically elevate the already-in-place first assistant to the acting role:  "When a vacancy arises . . . [i]f

29

the vacant officer has a first assistant, the first assistant performs the functions and duties of the office temporarily . . . because [the first assistant] is often a career official with knowledge of the office or a Senate-confirmed individual . . . the routine functions of the office should be allowed to continue . . . by that one person." *Id.* at 12. "[I]f there is no first assistant, and no presidential designation, no one may serve as acting officer." *Id.* at 14.[5] In other words, the existing first assistant takes over because that person is an experienced incumbent. If there is no such person when the vacancy occurs, the President must make a designation. Those statements are inconsistent with backfilled first assistants. ER-24-27; *see also Ramirez*, 2025 WL 3019248, at *9-

---

[5] *See also id.* (explaining that if the Senate rejects a first nomination, "the office [can] be temporarily filled by 'the person' who was originally eligible to be the acting officer at the time the vacancy arose"); *id.* at 34 (minority view) ("Section 3345(a)(1) of the bill can be read to provide that . . . only the 'first assistant' to the particular Senate confirmed officer . . . can be an acting officer."); 144 Cong. Rec. S11037 (daily ed. Sept. 28, 1998) (statement of Sen. Lieberman) ("[A] first assistant apparently can take over only if he or she was the first assistant at the time of the vacancy."), available at https://www.govinfo.gov/content/pkg/CREC-1998-09-28/html/CREC-1998-09-28-pt1-PgS11021.htm.

*10 (discussing both legislative history and purpose); *Giraud*, 2025 WL 2416737, at *17-*18 (same).

The government misreads the legislative history. It relies on the shift from the original bill's language "first assistant of such officer" to the final bill's phrase "first assistant to the office of such officer." PB-30. According to the government, Congress made that change to "depersonalize" the "overly restrictive" language, so its backfilling theory is correct. PB-31 (cleaned up).

To the contrary, the change was semantic. As the Senate report explained, "under current law, the term 'first assistant' is used to refer to the first assistant to the 'officer.' However, the practice under current law, which would be continued by this bill, is that the first assistant is actually the first assistant to the vacant office." S. Rep. 105-250 at 12; *see also* 144 Cong. Rec. S12822 (daily ed. Oct. 21, 1998) (statement of Sen. Thompson)[6] ("[T]he change in wording is not intended to alter case law on the meaning of the term 'first assistant.'"). The change merely conforms to "the practice under current law," S. Rep.

---

[6] Available at https://www.govinfo.gov/content/pkg/CREC-1998-10-21/html/CREC-1998-10-21-pt1-PgS12810-6.htm.

31

105-250 at 12, and does not contemplate backfilled first assistants. While some members viewed the initial bill as "overly restrictive," PB-31, the solution was to add subsection (a)(3) (the original bill contained only (a)(1) and (a)(2)). ER-25. The addition of (a)(3) had nothing to do with changing "office" to "officer."

"[T]he statute's overall purpose" leads to the same conclusion. *Gonzalez v. Herrera*, 151 F.4th 1076, 1081 (9th Cir. 2025). Congress enacted the FVRA "to strengthen" the prior vacancies statute; the Act "was framed as a reclamation of the Congress's Appointments Clause power." *SW General, Inc. v. N.L.R.B.*, 796 F.3d 67, 70 (D.C. Cir. 2015). "A statutory interpretation that opens a gaping loophole in this tightly crafted scheme meant to provide only limited flexibility and prevent 'manipulation' flies in the face of the goal that Congress was trying to accomplish." *Giraud*, 2025 WL 2416737, at *18.[7] "[I]t seems a little

---

[7] *See also* Brief for the Petitioner, *N.L.R.B. v. SW General, Inc.* (No. 15-1251), 2016 WL 4363344, at *8 (Aug. 12, 2016) (explaining the catalyst for the FVRA was an administration maneuver that in effect assigned an individual to a "first assistant" position "only *after* [the] PAS position became vacant") (citing Steven J. Duffield & James C. Ho, *The Illegal Appointment of Bill Lann Lee*, Note, 2 Tex. Rev. L. & Pol. 335, 348-53 (1998)); *id.* at *37-*38 (similar).

32

inconsistent to say that we have to interpret a statute that was designed to constrain presidential authority consistent with an understanding that Congress wanted the President to have essentially unlimited authority." *Learning Resources, Inc., et al. v. Trump* (No. 24-1287), Oral Argument Tr. at 18 (Statement of Jackson, J.) (Nov. 5, 2025).[8]

### 3. Case law uniformly supports this conclusion.

The consensus among courts is that the administration cannot backfill the first assistant role to designate a new acting officer.

Along with the district court, two other courts have issued recent decisions resolving this issue. Both have rejected the government's arguments. *Ramirez*, 2025 WL 3019248, at \*7 ("[S]ubsection (a)(1) . . . cannot be invoked after the fact to install a later-designated first assistant into the acting role."); *Giraud*, 2025 WL 2416737, at \*14 ("[A] 'first assistant' who may take office in an 'acting capacity' must be the first assistant at the time the vacancy occurs."); *see also id.* at \*14 n.155 (collecting cases).

---

[8] Available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-1287_b07d.pdf.

Additional cases provide more persuasive authority. *See SW General*, 796 F.3d at 76 ("Although we do not decide its meaning today, subsection (a)(1) may refer to the person who is serving as first assistant *when the vacancy occurs*."); *L.M.-M.*, 442 F. Supp. 3d at 26, 28 (D.D.C. 2020) (referencing "some doubt on whether Congress intended the phrase 'first assistant' to encompass those appointed to the first-assistant position after the vacancy arose" and explaining "labels—without *any* substance—cannot satisfy the FVRA's default rule"); *Williams v. Phillips*, 360 F. Supp. 1363, 1370 n.11 (D.D.C. 1973) (noting the acting officer "was not the first assistant to [the] former Director . . . at the time of the appointment").

The relevant precedent uniformly supports the defense: Ms. Chattah cannot qualify under subsection (a)(1) because she was not the first assistant when the vacancy occurred. By contrast, the government's side of the ledger is blank.

### 4. The government erroneously relies on a purported longstanding practice.

The government argues the Executive Branch has an entrenched practice of relying on backfilled first assistants, and Congress has

34

acquiesced to that practice. PB-22-23; PB-29-30. Neither point is well taken.

The government provides only two examples of backfilled first assistants serving as acting officers in prior administrations; those do not amount to proof of a "longstanding" and "routine[]" practice. PB-22. Even if the government could collect more examples, the Supreme Court has previously rejected an analogous argument regarding the FVRA and "post-enactment practice." *SW General*, 580 U.S. at 307.

The government relies on an opinion from the Office of Legal Counsel. PB-23. But *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), curtailed the concept of agency deference. Even before *Loper Bright*, this Court declined to defer to OLC opinions regarding the FVRA. *See Hooks*, 816 F.3d at 564. Making matters worse, OLC "has answered [the question] differently at different times." *L.M.-M.*, 442 F. Supp. 3d at 24; *compare* 23 Op. O.L.C. 60, *4 (1999) (question 13) (supporting the defense's interpretation), *with* 25 Op. O.L.C. 177, *3-*4 (2001) (supporting the government's interpretation). This shift undermines the second opinion's persuasive value, if any. *See Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (deference is "rarely" appropriate when

35

an agency's current construction conflicts with a prior one). The government suggests the second interpretation "significantly outweigh[s]" the first. PB-30. But the mere existence of the second opinion adds little to the analysis.

The same points apply to the government's reliance on a Government Accountability Office letter. PB-22-23. Deference is inappropriate. *See Hooks*, 816 F.3d at 564. The agency's shifting views underscore that conclusion. *Compare* Letter from Carlotta C. Joyner, Dir., Strategic Issues, GAO, to Fred Thompson, Chairman, U.S. Senate Comm. on Governmental Affairs, at 2 (Feb. 23, 2001)[9] ("Eligibility can be based on (1) service as a first assistant to the former holder of the position."), *with* Letter from Victor S. Rezendes, Dir., Strategic Issues, GAO, to U.S. Senators Joseph I. Lieberman and Dan Burton, at 2 (Dec. 7, 2001)[10] (finding OLC's revised interpretation "reasonable" and "concur[ring] with it"); *see Kisor*, 588 U.S. at 579.

---

[9] Available at http://www.gao.gov/assets/80/75036.pdf.

[10] Available at https://www.gao.gov/assets/gao-02-272r.pdf.

36

The government asserts Congress acquiesced to the second GAO opinion. PB-29-30. It cites *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981). There, Congress acquiesced to the government's interpretation because it previously "considered but rejected several proposals designed to limit" that interpretation. *Id.* at 685. There is no similar history here. *Dames* also found acquiescence because the government's interpretation was "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned." *Id.* at 686 (cleaned up).[11] Again, the government provides only two examples of backfilled first assistants predating this administration; even if it could identify more, the Supreme Court has previously rejected a similar acquiescence argument. *See SW General*, 580 U.S. at 307-08; *see also Giraud*, 2025 WL 2416737, at *11 (rejecting a similar acquiescence argument involving Section 546).

---

[11] The Court emphasized its decision was "confined to a resolution of the dispute before us"; it "attempt[ed] to confine the opinion only to the very questions necessary to decision of the case." *Id.* at 660-61.

The government's arguments fall short.  The Court should conclude the administration cannot designate an acting officer by backfilling the first assistant role.

### B.    Even if Ms. Chattah could serve as acting U.S. Attorney, her time has expired.

Assuming Section 3345(a)(1) authorizes backfilled first assistants, Ms. Chattah's time as acting U.S. Attorney has expired.

### 1.    Her time expired on July 25, 2025, under Section 546(c)(2).

First and most obviously, Ms. Chattah's appointment is invalid under her initial appointment mechanism:  Section 546.  Ms. Chattah was appointed as a temporary U.S. Attorney under that section on March 27, 2025 (effective April 1).  ER-183.  So she could "serve in that capacity" for only "120 days after appointment."  ER-183 (first quote); 28 U.S.C. § 546(c)(2) (second one).  That period—120 days from March 27—elapsed on July 25, 2025.  So Ms. Chattah has exceeded her 120-day temporary service cap under Section 546(c).

Indeed, that Ms. Chattah's appointment has exceeded Section 546(c)'s time limits is reason alone to conclude her appointment is unlawful.  That section allows "[a] person appointed as United States

38

attorney under this section" (like Ms. Chattah) to "serve" only "120 days after appointment." 28 U.S.C. §§ 546(c), (c)(2).[12] That rule limits Ms. Chattah to 120 days total for at least four reasons.

First, the text of Section 546(c) supports this conclusion. As a textual matter, "A person appointed as United States attorney under this section may serve until . . . the expiration of 120 days after appointment." 28 U.S.C. §§ 546(c), (c)(2). Ms. Chattah was appointed under Section 546. Textually, she may serve for only 120 days. The statute's text does not authorize an extension so long as the administration attempts to convert her designation to acting as opposed to interim officer.

Second, Section 546(c)'s time limit is more specific—and newer— than the FVRA's. *See, e.g.*, *RadLAX Gateway Hotel, LLC v.*

---

[12] The defense recognizes this Court has held that other appointment mechanisms (potentially including Section 546) are not "exclusive" of the FVRA. *Hooks*, 816 F.3d at 555. The defense maintains *Hooks* is incorrectly decided on that point; Section 546 should be understood as exclusive of the FVRA. ER-232 n.33 (preserving the same argument). Even assuming *Hooks*'s non-exclusivity holding is correct as a general matter, however, the particular language of Section 546(c)—capping "[a] person appointed . . . under this section" to 120 days of "serv[ice]"—prevents Ms. Chattah specifically from serving longer than 120 days as described below.

*Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[T]he specific governs the general.") (cleaned up); *Boudette v. Barnette*, 923 F.2d 754, 757 (9th Cir. 1991) ("When two statutes conflict the general rule is that the statute last in time prevails."). The newer and more specific time limits in Section 546 should govern over the older and more general time limits in the FVRA.

Third, applying Section 546(c)(2)'s time limit here prevents rendering Section 546(d)'s judicial appointment mechanism and its 150-year pedigree surplusage. *See TRW*, 534 U.S. at 31; *see generally* Act of Mar. 3, 1863, ch. 93, § 2, 12 Stat. 768 (1863) (giving courts appointment power over interim U.S. Attorneys); H.R. Rep. No. 110-58, at *4 (2007) (identifying that the Attorney General did not receive any power over interim appointments until 1986). Under the administration's reading, it can "foreclose the statutory power of the judges [of a district court] to appoint an interim U.S. Attorney" under Section 546(d) simply by converting the individual's status to acting U.S. Attorney. ER-10. If correct, its interpretation would render Section 546(d) mostly superfluous. But if Section 546(c)(2)'s time limit controls, then Section 546(d) continues to function.

Fourth, letting the administration avoid Section 546(c)(2)'s 120-day cap would perpetuate the very mischief Congress sought to stop when it enacted the limit in 2007: administrations pursuing indefinite temporary appointments without Senate involvement. *See, e.g., Bond v. United States*, 572 U.S. 844, 866 (2014) (identifying that courts can properly draw a statute's meaning from "the context from which the statute arose"); Samuel L. Bray, *The Mischief Rule*, 109 Geo. L. J. 967 (2021); *see also Giraud*, 2025 WL 2416737, at *11 (discussing the legislative purpose behind the 2007 enactment). Congress was concerned about this type of problem when it imposed the 120-day time limit. Ensuring the time limit applies here respects the mischief rule.

For its part, the district court did not resolve whether a Section 546 appointee (like Ms. Chattah) can avoid Section 546(c)(2)'s time limits by later invoking other temporary appointment authorities. *See* ER-13 (district court concluding that it "need not resolve [the issue] given its ruling below"). But if the Court has any doubts about whether Ms. Chattah's appointment complies with other statutes (as discussed, it does not), Section 546(c)'s 120-day cap provides another basis for affirmance here.

41

### 2. Her time expired under Section 3346 on November 16.

Alternatively, Ms. Chattah's temporary appointment expired on November 16, 2025. Even assuming Ms. Chattah was able to switch from Section 546(c)(2)'s time limits to the FVRA's, she could occupy the "acting" U.S. Attorney role for only 300 days after inauguration day. *See* 5 U.S.C. §§ 3346(a)(1) (giving 210 days "beginning on the date the vacancy occurs"), 3349a(b)(1) (when the vacancy exists at the beginning of a new incoming administration, starting the clock "90 days after such transitional inauguration day"). Since inauguration day was January 20, then, any FVRA appointment expired on November 16.[13]

## II. The administration cannot rely on general delegation authority to create a de facto acting officer.

As discussed above, Ms. Chattah is ineligible to serve as acting U.S. Attorney under Section 3345(a)(1). So the government proposes a workaround based on general delegation authority:

---

[13] The Court should still resolve the question whether Ms. Chattah was validly serving as acting U.S. Attorney between July 28 and November 16 because the defense's request for dismissal is tied to that question.

- The Attorney General can perform the responsibilities associated with the U.S. Attorney position, *see* 28 U.S.C. § 509;

- The Attorney General can also delegate her authority, *see* 28 U.S.C. § 510; therefore

- The Attorney General can delegate all the responsibilities of a vacant U.S. Attorney position to anyone within the Department of Justice—creating a de facto acting U.S. Attorney—without ever having to go through the FVRA.

If this theory were correct, the administration could fire every U.S. Attorney across the country, hire 91 brand new employees—who could be anyone—into the Department of Justice, and make those 91 new employees the de facto acting U.S. Attorneys for each district, indefinitely, without ever needing to seek Senate confirmation.

This theory is wrong. The FVRA was designed precisely to foreclose this argument. The theory would create substantial Appointments Clause concerns. And even if the theory were valid in the abstract, there are case-specific problems here. The Court should thus reject this effort at least thrice over.

43

## A. The government's theory is wrong.

Once again, the government's position violates the text, the case law, and the legislative history. Its attempt to rely on Executive Branch practice is likewise unpersuasive.

### 1. Text and case law resolve the issue.

The text prohibits the government's tactic, and the case law confirms that conclusion. The government's textual arguments and case citations are unconvincing.

#### a) Section 3347 and *Gonzales* foreclose the government's argument.

Under the FVRA, "Sections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office" requiring Senate confirmation. 5 U.S.C. § 3347(a). An exception exists if another "statutory provision expressly authorizes [the administration] to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* § 3345(a)(1) & (1)(A). 28 U.S.C. § 546 appears to qualify for this exception. But "[a]ny statutory provision providing general authority to [an agency] head . . . to

44

delegate duties statutorily vested in that agency head . . . is not a statutory provision to which subsection (a)(1) applies." 5 U.S.C. § 3347(b). In other words, a statute allowing an agency head to delegate duties (like 28 U.S.C. § 510) is not a statute that creates an exception to the otherwise exclusive procedures in Section 3345.

Section 3347(b) "clarifies that general vesting-and-delegation statutes are not sufficient to authorize the department to choose the acting officer under the FVRA." *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1078 (9th Cir. 2024). "[A] department head cannot rely on a general vesting-and-delegation statute to designate the acting officer in the event of a vacancy." *Id.* at 1078. "[A]gencies hypothetically could rely on their vesting-and-delegation authority [to designate a de facto acting officer], even if knowingly violating the FVRA, but that would [not] make their actions immediately lawful." *Id.* at 1077. Rather, the purported de facto acting officer's actions would be unlawful.

The Attorney General has nevertheless purported to delegate every responsibility of the vacant U.S. Attorney position to Ms. Chattah as a de facto acting U.S. Attorney. "This argument runs headlong into"

45

Section 3347 and *Gonazles*. ER-27; *see also Ramirez*, 2025 WL 3019248, at *11-*12 (similar); *Giraud*, 2025 WL 2416737, at *21-*25 (similar).

### b) The government's analysis is incorrect.

The government believes Section 3347 performs no work here. It invents a purely semantic "distinction between an acting official" and a de facto acting official "exercising a vacant office's powers by delegation." PB-39.[14] The Court should reject this artifice. "[L]abels— without *any* substance—cannot satisfy the FVRA." *L.M.-M.*, 442 F. Supp. 3d at 26 (rejecting a government argument regarding subsection (a)(1)).

The government claims its contrived distinction is significant for a myriad of implausible reasons. First, it suggests "acting officer" and "acting capacity" are terms of art that exclude de facto acting officers. PB-38-41. Its analysis on that point is hard to parse. Whatever the government's argument, it is wrong. The definition of "acting officer" is

---

[14] The government accuses the district court of having "misunderstood [its] argument." PB-48. To the contrary, the government on appeal has abandoned its primary argument below, which relied on a definition of "function or duty" that by its terms is limited to Section 3348. ER-84-98.

"[o]ne performing the duties of an office—[usually] temporarily—but who has no claim of title to the office." Black's Law Dictionary, "Officer" (12th ed. 2024). Ms. Chattah is purporting to do just that.

Second, the government observes that an acting officer secures power from Section 3345, while a de facto acting officer derives authority through delegation. PB-39-40. That observation simply restates the nature of the Section 3347 violation. A de facto acting officer receiving power via delegation is precisely what Section 3347 prohibits.

Third, the government invokes rare situations when a vacant office has nondelegable powers. As background, Section 3348(d) imposes a so-called ratification bar. The bar applies when a statute or regulation requires a specific action "to be performed by the applicable officer (and only that officer)." 5 U.S.C. §§ 3348(a)(2)(A)(ii), (B)(i)(II). Those actions are considered "exclusive, or nondelegable." *Gonzales*, 107 F.4th at 1074. If an invalid acting officer performs a nondelegable function, the action "has no force or effect" and "may not be ratified" later by a properly serving officer. 5 U.S.C. § 3348(d)(2). Some functions are delegable, i.e., "dut[ies] which the [officer] can lawfully

47

delegate." *Gonzales*, 107 F.4th at 1074. If an invalid acting officer performs a delegable function, the action is not "immediately lawful"— rather, it is unlawful. *Id.* at 1077. A properly serving officer could ratify the decision later, but ratification "is not inevitable." *Id.*

The government observes that an acting officer under Section 3345 can exercise the vacant office's nondelegable powers, while a de facto acting officer cannot. PB-40. The government maintains that distinction is relevant to understanding Section 3347, but it fails to make the connection. Section 3347 prevents agency heads from naming de facto acting officers via delegation. Its prohibition presumes an agency head is attempting to delegate the office's "delegable duties," not the office's nondelegable duties, which by definition are nondelegable. ER-30. The statute "would become meaningless" if all it did was prohibit an agency head from delegating duties that cannot be delegated in the first place. ER-30.

Even if the distinction were relevant in the abstract, it becomes irrelevant in practice. It is uncommon for offices to have nondelegable powers. *See Kajmowicz v. Whitaker*, 42 F.4th 138, 151 (3d Cir. 2022) ("[M]ost statutes that confer authority will permit subdelegation."). For

48

example, the government asserts a U.S. Attorney has no nondelegable powers. PB-52.[15] The distinction is therefore meaningless both here and in the mine run of cases. Thus, under the government's interpretation, multiple statutes—Section 3345, position-specific vacancies statutes like Section 546, and statutory provisions requiring Presidential appointment and Senate confirmation of permanent officers like Section 541—are superfluous for most Executive Branch offices; these statutes perform necessary work only for the small category of offices that have nondelegable duties.[16] This "bizarre" interpretation is—and must be—incorrect. *Cent. Bank of Denver, N.A.*

---

[15] The government nevertheless suggests an acting U.S. Attorney is more powerful than a de facto acting U.S. Attorney because Congress might assign new nondelegable duties to the U.S. Attorney in the future, and because de facto acting U.S. Attorneys might face litigation risk in the future over whether certain functions are delegable. PB-53 n.12. The government does not explain why these hypotheticals are relevant to interpreting Section 3347. Rather, the government claims Ms. Chattah can currently exercise every responsibility of the vacant U.S. Attorney position, so the distinction between nondelegable and delegable duties performs no work in this case at this moment.

[16] Indeed, Congress's decision in 2007 to impose a 120-day deadline in Section 546(c)(2) would have been superfluous, because (the government asserts) the administration can simply name indefinite de facto acting U.S. Attorneys.

*v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 188 (1994) (cleaned up).

The government finds it odd that "Congress would enact a remedial scheme [in Section 3348(d)] that provided no remedy for . . . the unlawful exercise of delegable authority in violation of § 3347." PB-49. But "who is authorized to act and the various consequences of an unauthorized person's actions are not necessarily congruent, and [] Congress was aware of this when it drafted the FVRA." *Gonzales*, 107 F.4th at 1078-79. An unlawful exercise of nondelegable authority means the action is "void" and cannot be ratified later; an unlawful exercise of delegable authority means the action is "voidable" but potentially subject to ratification. *Id.* at 1078 (cleaned up). Either way, the exercise of authority is unlawful in the moment.

Fourth, the government asserts the Attorney General is not delegating the powers of the vacant U.S. Attorney position but is instead delegating her own powers. PB-47; PB-53-54. But Section 3347 prohibits an agency head from creating a de facto acting officer by "delegate[ing] duties statutorily vested in that agency head." Here, the relevant responsibilities may simultaneously belong to the vacant U.S.

50

Attorney's office and the Attorney General, as the government insists; the prohibition remains the same.

Fifth, the government relies on a 2009 Congressional enactment referencing individuals serving "in an acting or temporary capacity." PB-43 (cleaned up). The government fails to explain the significance. Perhaps it believes the phrase "or temporary" is notable. But sometimes temporary officers use different titles—consider the distinction between a Section 3345 acting U.S. Attorney and a Section 546 interim U.S. Attorney in this case. This enactment provides the government with quite a thin reed.

Sixth, the government fails to understand *Gonzales* and relies instead on out-of-circuit decisions. PB-37; PB-43-46. Unlike *Gonzales*, those citations are non-binding. They are also off point or poorly reasoned. Either way, they do not support the government's position.

In *Kajmowicz v. Whitaker*, 42 F.4th 138 (3d Cir. 2022), the court interpreted the ratification bar in Section 3348(d). As with *Gonzales*, *Kajmowicz* concluded the ratification bar applies only to nondelegable functions, not delegable functions. Nothing in *Kajmowicz* supports the government's conclusion that the administration may use delegation

51

authority to create a de facto acting officer in the typical case where the position contains only delegable duties. ER-30 n.8; *see also Giraud,* 2025 WL 2416737, at \*25 (similar).

In *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328 (Fed. Cir. 2022), the court suggested the entire "FVRA applies only to non-delegable duties." *Id.* at 1335. Its analysis incorrectly relied on a definitional phrase that is limited to Section 3348. That section narrowly defines "function or duty" to mean nondelegable duties. But the definition applies only "[i]n this section," i.e., only in Section 3348. 5 U.S.C. § 3348(a). Other portions of the Act, including Sections 3345 and 3347, use the term "function or duty" in the broader sense of the officer's full suite of responsibilities, both delegable and nondelegable. But *Arthrex* never mentions how Section 3348(a) cabins its definition to "this section." This is "a significant omission in the opinion." ER-30 n.8; *see also Giraud,* 2025 WL 2416737, at \*25 (similar). The government disputes whether *Arthrex* made this mistake, PB-50, but the error speaks for itself, as the district court and *Giraud* make clear. *Gonzales* correctly declined to follow *Arthrex*'s course and instead

52

confirmed that when an invalid acting officer exercises a delegable function, the action is "voidable." 107 F.4th at 1077 (cleaned up).

In *Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132 (2d Cir. 2009) (per curiam), the court addressed an agency regulation that assigned a specific duty to a specific office, or to the officer's authorized representative. During a vacancy, the agency head selected another employee to be the authorized representative. The court found the delegation consistent with the FVRA. That case involved a single function and a regulation explicitly authorizing multiple employees to perform that function. It sheds no light on the government's attempt here to designate a de facto acting U.S. Attorney with all the responsibilities and powers of a permanent U.S. Attorney. *See Giraud*, 2025 WL 2416737, at *25 n.251.

In *Stand Up for California! v. United States Dep't of the Interior*, 994 F.3d 616 (D.C. Cir. 2021), the court analyzed whether the agency had "power to redelegate final decision-making authority." *Id.* at 621. The court briefly mentioned the FVRA during its analysis but recognized the plaintiffs had "not raised their FVRA claims on appeal." *Id.* at 622 n.2. It therefore discussed the statute only to the extent it

shed light on "whether redelegation of final decisionmaking authority is permissible." *Id.* at 622. The case thus provides scant guidance here. *See Giraud*, 2025 WL 2416737, at *25 n.251.

At bottom, the government cannot escape *Gonzales*'s holding that "general vesting-and-delegation statutes are not sufficient to authorize the department to choose the acting officer under the FVRA." 107 F.4th at 1078. That holding forecloses the government's argument here.

### 2. The theory is irreconcilable with legislative history and Congressional purpose.

Once again, if a resort to legislative history and purpose is necessary, they further support the statute's plain text meaning. *See Gonzalez*, 151 F.4th at 1081; *Murphy Co.*, 65 F.4th at 1135.

Congress enacted Section 3347 because of "a specific past practice of the executive branch." *Gonzales*, 107 F.4th at 1078 n.7. "[T]he Department of Justice maintained that its general vesting and delegation authority permitted the Attorney General to reassign the duties of . . . Senate-confirmed positions to other officials of the Department." *Id.* (cleaned up). "The general delegation exclusion in § 3347(b) addresses this specific problem of agencies evading the

54

requirements for designating acting officers." *Id.* (cleaned up); *see also* ER-31 (quoting this language). As the legislative history explains, the statute "forecloses the argument raised by the Justice Department that [general delegation statutes], rather than the Vacancies Act, apply to vacancies in that department." S. Rep. No. 105-250 at 17; *see also* ER-31 (quoting this language).

"In other words, the argument now made by the government was expressly rejected by Congress in 1998." ER-32; *see also Ramirez*, 2025 WL 3019248, at *12 (similar); *Giraud*, 2025 WL 2416737, at *22 (similar). The government is now attempting to revive the very same argument that prompted Congress to pass the FVRA in the first place.

Insisting otherwise, the government relies on one stray portion of the legislative history: "Delegable functions of the office could still be performed by other officers or employees." S. Rep. No. 105-250 at 18; *see* PR-36; PR-51 n.11. Perhaps that snippet envisions an agency head delegating one function to one employee and another function to another employee. But it cannot be read to suggest an agency head may vest *all* the responsibilities of a vacant office in one person—in essence creating a de facto acting officer lacking only the formal title.

55

Regardless, this single sentence does not outweigh the bulk of the legislative history, much less the text itself, both of which overwhelmingly support the defense's position.

### 3. The government erroneously relies on a purported Executive Branch practice.

Once again, the government invokes a supposedly longstanding Executive Branch practice of using general delegation authority to designate de facto acting officers. PB-34-37; PB-56. The purpose of the FVRA was to *stop* that practice. Either way, the government's analysis fails for the same reasons identified above.

The government asserts, for instance, the designation of de facto acting officers is a "common," "well-established practice." PB-34; PB-56. But it provides only a handful of examples. PB-35-36 & n.8. Regardless of the precise number of examples, the Court should reject this argument about the FVRA and "post-enactment practice." *SW General*, 580 U.S. at 307.

The government also relies on one OLC opinion and four GAO opinions. PB-34; PB-36-37 & n.9. Neither category qualifies for deference. *See Hooks*, 816 F.3d at 564. The OLC opinion suggests

56

certain tasks of the vacant office could "be delegated to other appropriate officers and employees in the agency." 23 Op. O.L.C. 60, *11 (1999) (question 48). But it recognizes "[t]he Act makes clear . . . that an agency's [general delegation] statute does not provide authorization for filling PAS positions on a temporary basis." *Id.* at *3 (question seven); *see also id.* (question nine) (similar). The GAO letters contain brief analysis regarding the ratification bar in Section 3348 but nowhere mention Section 3347. They fail to appreciate that if "agencies . . . rely on their vesting-and-delegation authority [to create a de facto acting officer], [while] knowingly violating the FVRA . . . their actions [are not] immediately lawful," even if those actions may be ratified later. *Gonzales*, 107 F.4th at 1077.

Finally, the government ends where it starts: an appeal to policy. In its view, an inability to select de facto acting officers will "effectively cripple" and "significantly upend the ordinary functions of the government." PB-56 (cleaned up); *see also* PB-1 (similar). But Congress made a considered judgment when it passed the FVRA to forbid this practice and "recla[im] [its] Appointments Clause power." *SW General*, 796 F.3d at 70. If the government is concerned about its orderly

57

functioning—ten months into this new administration—the Constitution provides a simple answer: nomination and confirmation of a permanent officer.

**B.    The government's theory would violate the Appointments Clause.**

If the Court concludes that Ms. Chattah's ongoing service as temporary U.S. Attorney complies with the governing statutes, it will be ratifying a vacancy scheme in which the Attorney General can designate never-confirmed individuals to serve as U.S. Attorneys potentially in perpetuity. Such a regime is incompatible with the Appointments Clause. U.S. Const. art. II, § 2, cl. 2.

That clause requires Senate confirmation for all principal officers, including individuals serving indefinitely as "temporary" U.S. Attorneys. And even for inferior officers, the Constitution's default rule remains Senate confirmation. Congress may modify that rule only "by law"—that is, by enacting a statute that authorizes appointments by the head of a department. So a non-confirmed officer serving without statutory authorization violates the Constitution itself. Whatever labels the administration places on Ms. Chattah, her service

58

as the de facto acting U.S. Attorney is both unlawful and unconstitutional.

### 1. Indefinitely serving "temporary" U.S. Attorneys are principal officers.

First, under modern Supreme Court doctrine, indefinitely serving "temporary" U.S. Attorneys are principal officers requiring Senate confirmation. That much is true for full-on U.S. Attorneys post-*Arthrex*. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 16-17 (2021). And it is equally true for indefinitely serving "temporary" U.S. Attorneys (as the government's theory would allow Ms. Chattah to serve). Because such individuals do not serve "for a limited time, and under special and temporary conditions," they are subject to the same treatment as the permanent version of the office. *United States v. Eaton*, 169 U.S. 331, 343 (1898). As a result, the government's theory, if accepted, would violate the Appointments Clause.

### a) U.S. Attorneys are principal officers.

U.S. Attorneys are principal officers who must be appointed by the President and confirmed by the Senate. U.S. Const. art. II, § 2, cl. 2. That much is true under various Supreme Court authorities—but is

59

especially true after the Supreme Court's most recent articulation of the test in *Arthrex*. [17]

Starting with the older authorities, the Supreme Court addressed the distinction between principal and inferior officers in *Morrison v. Olson*, 487 U.S. 654 (1988), and in *Edmond v. United States*, 520 U.S. 651 (1997). Those cases found the relevant officers to be inferior—but in ways that produce the opposite result here. Specifically, four factors supported the inferior-officer status conclusion in *Morrison*: "that the independent counsel was subject to removal by a higher officer (the Attorney General), that she performed only limited duties, that her jurisdiction was narrow, and that her tenure was limited." *Edmond*, 520 U.S. at 661 (citing *Morrison*, 487 U.S. at 671-72).

Each of those factors cuts the other way here. U.S. Attorneys are removable only by the President, not the Attorney General. 28 U.S.C. § 541(c). Their sweeping duties include "prosecut[ing] all offenses

---

[17] The Supreme Court has never directly addressed this question. Dicta in *Myers v. United States*, 272 U.S. 52 (1926), suggested that U.S. Attorneys are inferior officers, *id.* at 159, but the issue was not before the Court in that case, which concerned a postmaster's removal. By contrast, later authorities support the conclusion that U.S. Attorneys are principal officers.

60

against the United States," *id.* § 547(1), and litigating "all civil actions, suits or proceedings in which the United States is concerned," *id.* § 547(2). They serve as "the chief federal law enforcement official for the judicial district," *Nadler v. Mann*, 951 F.2d 301, 305 (11th Cir. 1992) (citing 28 U.S.C. §§ 541, 547)—here, that jurisdiction covers an entire state and its population of over 3 million people. Their tenure is not limited to specific matters or tasks, and their four-year terms continue indefinitely until a "successor is appointed and qualifies." 28 U.S.C. § 541(b).

*Edmond* clarified that *Morrison*'s factors did not constitute "a definitive test." 520 U.S. at 661. But many of the factors emphasized in *Edmond* are likewise absent as to U.S. Attorneys. No Senate-confirmed officer (like the Attorney General) exercises the "powerful tool for control" that is removal from office. *Id.* at 664. And U.S. Attorneys routinely and unilaterally "render a final decision on behalf of the United States," *id.* at 665, for example, by exercising "plenary authority with regard to federal criminal matters" "within [their] district[s]," and through "authoriz[ation] to take all necessary steps to protect the

61

interests of the United States" "in a great many instances" of civil litigation, *see* U.S. Dep't of Just., Just. Manual §§ 4-1.300, 9-2.001.[18]

The fact that the Attorney General supervises the work of U.S. Attorneys in some respects does not defeat their status as principal officers. Even extensive supervision and oversight by a Senate-confirmed official cannot render supervisees inferior if they exercise significant and binding executive authority on their own. *See Arthrex*, 594 U.S. at 16-17. In finding an Appointments Clause problem with respect to Administrative Patent Judges, the Supreme Court explained, "In all the ways that matter to the parties who appear before the [Patent Trial and Appeal Board], the buck stops with the APJs, not with the Secretary or Director." *Id.* at 17; *see also Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1339 (D.C. Cir. 2012) ("We find that, given the [Copyright Royalty Judges'] nonremovability and the finality of their decisions . . . the Librarian's and Register's supervision functions still fall short of the kind that would render the CRJs inferior officers."). So, too, with U.S. Attorneys. For the mine run

---

[18] Available at https://www.justice.gov/jm/.

of defendants, the local U.S. Attorney's office initiates the prosecution, controls dismissal, and negotiates binding plea agreements without approval or review by Washington, D.C. The buck stops with them— not the Attorney General.

This Court previously concluded U.S. Attorneys are inferior officers, *see United States v. Gantt*, 194 F.3d 987, 999-1000 (9th Cir. 1999), but *Gantt* is clearly irreconcilable with *Arthrex* and therefore nonbinding. The *Gantt* panel relied on the Attorney General's statutory authority to reassign cases, set salaries, and approve reimbursements. *Id.* At the same time, without any reasoning, it brushed aside a "significant statutory limit on the Attorney General's supervision of United States Attorneys," i.e., "Congress' decision to vest appointment and removal power in the President." *Id.* at 1000. *Arthrex* squarely undermined *Gantt*'s analysis. The Administrative Patent Judges in *Arthrex* were subject to comprehensive administrative supervision and the threat of reassignment by superior officers, but they were not removable by the Secretary of Commerce at-will. 594 U.S. at 15-17. That supervision did not cure the Appointments Clause problem in *Arthrex*, and it does not do so here. Because *Gantt* is "clearly

63

irreconcilable with" *Arthrex*, this Court is bound by the latter and should "reject [*Gantt*] as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

### b) Indefinitely serving "temporary" appointees warrant the same treatment.

Ms. Chattah's designation as de facto acting U.S. Attorney does not solve the constitutional problem. Unbounded by the time limitations imposed by Congress, Ms. Chattah's service may be temporary in name only—so her service therefore requires Senate confirmation.

Courts have historically conferred inferior-officer status on individuals designated to serve temporarily in roles that would otherwise be categorized as principal officers. *See, e.g.*, *Eaton*, 169 U.S. at 343-44 (acting Consul General); *Rop v. Fed. Hous. Fin. Agency*, 50 F.4th 562, 569-74 (6th Cir. 2022) (acting Federal Housing Finance Agency Director).

But that principle has always presumed compliance with the significant limitations imposed by Congress on temporary service. Acting officers are inferior when they serve "for a limited time, and

under special and temporary conditions." *Eaton*, 169 U.S. at 343. In *Rop*, the Sixth Circuit referenced "concerns that a President could abuse [a vacancy] provision by unilaterally firing the [Federal Housing Finance Agency] Director and indefinitely replacing him with an Acting Director, with no intent of ever seeking the advice and consent of the Senate." 50 F.4th at 571; *see also id.* at 585 (Thapar, J., concurring in part and dissenting in part) (rejecting the proposition that an acting official can constitutionally "perform every function of his office indefinitely, with no end in sight" and "limited only by the President's inclination to appoint a successor").

The government's current approach to designating de facto acting U.S. Attorneys—potentially in perpetuity—carries insufficient limitations and therefore fails to relegate them to inferior-officer status. As Justice Thomas has explained, there is "nothing 'special and temporary' about" indefinite acting service in a principal-officer role, and "the structural protections of the Appointments Clause [cannot] be avoided based on such trivial distinctions" as merely labeling someone an acting official. *SW General*, 580 U.S. at 313 n.1 (Thomas, J., concurring).

The Court can and should resolve this question of Ms. Chattah's eligibility based on the statutory arguments set out above. But if it concludes Ms. Chattah's de facto acting service complies with the governing statutes as a technical matter, the Constitution provides a backstop, and the Court should reject Ms. Chattah's continued service as incompatible with the Appointments Clause. At a minimum, it should resolve the statutory arguments in the defense's favor to avoid these substantial constitutional concerns. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (discussing the canon of constitutional avoidance).

### 2. Even if U.S. Attorneys are inferior officers, there is still an Appointments Clause problem.

Constitutional problems persist with the administration's theories even if indefinite "temporary" U.S. Attorneys are inferior officers. The constitutional default is Senate confirmation even for such officers. And while the Constitution allows Congress to vest some inferior-officer appointment power in agency heads by statute, such statutes are interpreted narrowly. Here, the only exceptions are Section 3345 and Section 546. Ms. Chattah's continued service is inconsistent with those

66

statutes. The upshot: failure to abide by those statutes is both a statutory problem and a constitutional one.

The constitutional default rule for all officers—including inferior ones—is Senate confirmation. U.S. Const. art. II, § 2, cl. 2. The Excepting Clause provides the only exception: "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* And so a department head cannot constitutionally appoint someone to an inferior office unless Congress has passed a law vesting the department head with that appointing authority. *E.g.*, *Myers*, 272 U.S. at 162 ("Congress must determine . . . that it is willing that the office shall be filled by the appointment by some other authority than the President with the consent of the Senate.").

That limit, the Supreme Court has identified, is an explicitly constitutional one. In its words, an agency head "has no constitutional prerogative of appointment to offices independently of the legislation of congress." *United States v. Perkins*, 116 U.S. 483, 485 (1886). That similarly means that, when Congress has not vested appointing authority in an agency head, an inferior officer's appointment by an

67

agency head and subsequent service are at once unlawful and unconstitutional. *See, e.g.*, *United States v. Maurice*, 26 F. Cas. 1211, 1216 (C.C.D. Va. 1823) (Marshall, C.J.) ("I know of no law which has authorized the secretary of war to make this appointment. . . . Maurice cannot be considered as a regularly appointed agent of fortifications."). And if a prosecutor lacks proper legal authorization, "then he cannot proceed with [a] prosecution. A private citizen cannot criminally prosecute anyone." *Trump v. United States*, 603 U.S. 593, 643 (2024) (Thomas, J., concurring).

Strict adherence to Excepting Clause-generated statutes prevents circumvention of Congress's constitutional authority—in particular, its authority in "the prescribing of reasonable and relevant qualifications and rules of eligibility of appointees, and the fixing of the term for which they are to be appointed." *Myers*, 272 U.S. at 129. When agency heads appoint officials outside the statutory pathways set by Congress, they obstruct the latter's constitutional role. *See id.* Thus, "there can be no expansion of the vesting power beyond what is permitted in the Clause, and there can be no usurpation of the appointment power 'by

68

indirection.'" *United States v. Trump*, 740 F. Supp. 3d 1245, 1261 (S.D. Fla. 2024).

Against this constitutional backdrop, courts should decline to give a "broad reading" to statutes that, according to the government, deviate from the Constitution's default Senate-confirmation rule. *Trump*, 740 F. Supp. 3d at 1284. Concluding that Congress has vested appointment authority merely by implication would "result[] in precisely the type of diffusion and encroachment that concerned the Framers in drafting the Appointments Clause." *Id.* That is even more so because Congress knows how to vest and regulate inferior-officer appointment authority explicitly when it intends to do so. *See Weiss v. United States*, 510 U.S. 163, 170-71 (1994) (disagreeing that Congress regulated military-judge appointments "by implication" when Congress "has not hesitated" to legislate "expressly" as to similar positions); *Trump*, 603 U.S. at 648 (Thomas, J., concurring) (explaining that no statute appeared to authorized the office of special counsel, "especially not with the clarity typical of past statutes used for that purpose"). In short: in this context, a statutory violation is also a constitutional one.

69

All this means that, even if Ms. Chattah would otherwise be an inferior officer, the administration's violations of Congress's limited vacancy-filling mechanisms are also violations of the Appointments Clause. Exercising its Excepting Clause power, Congress carefully prescribed narrow—and temporary—exceptions to the default Senate-confirmation rule. And the administration has exceeded its power under those exceptions. So the administration has likewise run afoul of the Appointments Clause. A "broad reading" of the administration's general delegation authority is inconsistent with the relevant constitutional values. *Trump*, 740 F. Supp. 3d at 1284. At a minimum, the constitutional problems with the government's interpretations further support the defense's reading of the relevant statutes. *See, e.g.*, *Jennings*, 583 U.S. at 296.

### 3. A de facto acting officer is not a temporary officer.

Finally, the same is true whatever formal title the administration provides Ms. Chattah. The relevant tests are functional—not formalistic. *See Arthrex*, 594 U.S. at 16-17; *Eaton*, 169 U.S. at 343-44; *Myers*, 272 U.S. at 129; *see also SW Gen.*, 580 U.S. at 313 n.1 (Thomas,

70

J., concurring).  So, as with the statutory analysis, "labels—without *any* substance—cannot" solve the constitutional problem.  *L.M.-M.*, 442 F. Supp. 3d at 26.  However the administration casts Ms. Chattah's role, then, she cannot constitutionally exercise the powers of the U.S. Attorney unless she satisfies the narrow statutory framework Congress has laid out.  *See id.*  Since she has not met those requirements, her role violates both the relevant statutes and the Constitution.

C. **Even if the government's theory is correct in general, there are case-specific problems.**

Assuming the administration can create de facto acting officers as a general matter (as detailed above, it cannot), there are further case-specific problems here.  The Attorney General lacks statutory authority to hire a special attorney who exercises the full functions of a U.S. Attorney.  And the Attorney General did not personally conduct the delegation at issue here.  These problems independently prevent Ms. Chattah from exercising the powers of a U.S. Attorney.

1. **There is no authority to appoint a special attorney to serve as a de facto U.S. Attorney.**

The statutory regime allows the Attorney General to hire a special attorney to assist a U.S. Attorney—not to act as the U.S. Attorney.

71

28 U.S.C. § 543 is captioned "[s]pecial attorneys."  The statute allows the Attorney General to "appoint attorneys to assist United States attorneys when the public interest so requires."  *Id.* § 543(a).  Separately, 28 U.S.C. § 515(a) states that "any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding . . . which United States attorneys are authorized by law to conduct, whether or not [the special attorney] is a resident of the district."  Section 515(b) requires special attorneys to take an oath and allows the Attorney General to set their salaries.

The Attorney General hired Ms. Chattah as a special attorney purportedly under Section 515.  ER-187; ER-192.  But Section 515 does not provide independent appointment authority.  Rather, it provides rules for special attorneys appointed "under law," i.e., under Section 543.  In turn, Section 543 authorizes the Attorney General to hire a special attorney only to assist a U.S. Attorney—not to "exercis[e] the full power of a United States Attorney."  *Trump*, 740 F. Supp. 3d at

72

1276.[19]  Because the Attorney General is improperly using Section 515

to designate Ms. Chattah as a de facto U.S. Attorney, not an assistant

to a U.S. Attorney, the delegation violates the statutory framework.

### 2.  The Attorney General did not properly delegate the authority.

Moreover, the Attorney General did not actually delegate the

authority Ms. Chattah now claims to possess.  *See* ER-116-19 (district

court identifying this issue).  To validly delegate authority to a special

attorney under the relevant statutes, the "Attorney General" must

"authoriz[e]" and "specifically direct[]" the special attorney to perform

specific functions.  28 U.S.C. §§ 510 (first quote), 515 (second one).  And

the Attorney General did not issue a "broad delegation" of the sort the

government now claims.  ER-117 (district court noting as much); *see*

---

[19] *See also Trump*, 603 U.S. at 648 (Thomas, J., concurring) ("Section 515 contemplates an 'attorney specially appointed by the Attorney General *under law*,' thereby suggesting that such an attorney's office must have already been created by some other law."); *but see United States v. Plesinski*, 912 F.2d 1033, 1037 n.5 (9th Cir. 1990) (stating in dicta that "Sections 543 and 515 are considered independent statutory authorizations"); *United States v. Hawthorne*, 626 F.2d 87, 89-90 (9th Cir. 1980) (per curiam) (adopting a district court decision rejecting an argument that Section 515's procedural requirements apply to Section 543 appointments).

73

*generally* ER-186-93 (purported delegation paperwork). Rather, the Attorney General merely appointed Ms. Chattah as a special attorney and designated her as first assistant. ER-187. In so doing, the Attorney General did not delegate Ms. Chattah any functions or duties. ER-187. Rather, the relevant delegation appears to have come from an HR employee—who lacks any statutory authority to delegate prosecutorial power, let alone all the functions of a U.S. Attorney. ER-192-93; *see also* ER-118-19 (government conceding that the Attorney General "didn't sign this letter"). Accordingly, Ms. Chattah's own appointment does not vest her with the powers the government now claims. *See* 28 U.S.C. §§ 510, 515.

### D. Assuming Ms. Chattah is a special attorney and a first assistant, she still cannot lead the office.

All else failing, the government claims for the first time on appeal that it never actually had to satisfy the FVRA because it could simply place all the relevant U.S. Attorney responsibilities into the first assistant U.S. Attorney role Ms. Chattah now holds. *See* PB-48-49, 54-56 (citing primarily *Ramirez*, 2025 WL 3019248, at \*18-\*19); *but see* ER-154-81 (government not raising this argument to the district court).

74

There is at least one preliminary issue with such a belated claim. Any bid to create a de facto acting U.S. Attorney (including via this first-assistant argument) runs into the same barriers as the general delegation arguments addressed above—namely, that the FVRA prevents the creation of de facto acting officers outside the statute's strictures. *E.g.*, *Gonzales*, 107 F.4th at 1078 n.7. The Court therefore need not even address the government's new first-assistant argument, which does no work independent of its broader general delegation argument.

But even setting that issue aside, the government's new claim is also deficient on its own terms. Most obviously, the government mistakes the role of first assistant U.S. Attorney for a statutory office. "First assistant" is merely a regulatory label identifying who slots into the "acting" role when a Senate-confirmed U.S. Attorney vacates the

office.[20]  28 C.F.R. § 0.137(b);[21] *see L.M.-M.*, 442 F. Supp. 3d at 27 ("[B]y the time Congress enacted the FVRA a practice had developed of designating some first assistants by regulation.").  And while it may be true as a matter of convention that properly serving U.S. Attorneys sometimes delegate their first assistants supervisory responsibilities, no source of law lets a standalone first assistant U.S. Attorney exercise the full suite of a U.S. Attorney's responsibilities.  *Contra* PB-54-56 (not citing a statute or regulation allowing as much).  Indeed, if the government were right that it can place all a U.S. Attorney's powers in a first assistant, the relevant statutes—the FVRA's narrow vacancy-filling mechanisms; the position-specific vacancy statute; and, for that matter, the Senate confirmation requirements for the U.S. Attorney

---

[20] As identified above, Section 3345(a)(1) requires the first assistant to be already-in-place when the vacancy arises—something not true of Ms. Chattah.

[21] "Every office within the Department to which appointment is required to be made by the President with the advice and consent of the Senate ('PAS office') shall have a First Assistant within the meaning of the [FVRA].  Where there is a position of Principal Deputy to the PAS office, the Principal Deputy shall be the First Assistant.  Where there is no position of Principal Deputy to the PAS office, the First Assistant shall be the person whom the Attorney General designates in writing."

position more generally—would be rendered mostly superfluous. *But see* 5 U.S.C. § 3345(a); 28 U.S.C. §§ 541(a), 546. And as described above, such an interpretation would flout Congress's constitutional designations for filling these positions. Such an interpretation should thus be avoided.

At bottom, then, the government's claim that Ms. Chattah "remains the First Assistant U.S. Attorney" may be correct as far as it goes. PB-54. But that does not give her U.S. Attorney powers today. *Contra id.* The only benefit she gets from that label would occur in the future—she would presumably become the acting officer if some new Senate-confirmed U.S. Attorney assumes (and then vacates) the office. *See* 5 U.S.C. § 3345(a)(1). She cannot, however, become the de facto acting U.S. Attorney just because she has the regulatory first assistant title. *Cf. id.*

*    *    *

Ms. Chattah is illegally serving as a temporary U.S. Attorney. No statute authorizes her continued service. And blessing the government's various post-hoc efforts to keep her in office without

77

Senate approval would threaten to render the applicable Appointments Clause scheme a nullity. This Court should affirm.

## III. The district court erroneously failed to dismiss the indictments.

Although the district court correctly concluded Ms. Chattah is ineligible to lead the U.S. Attorney's office, it incorrectly refused to dismiss the indictments, which the government obtained while Ms. Chattah was impermissibly leading the office. The relevant statutes, the judiciary's inherent supervisory powers, and the Supreme Court's articulation of appropriate remedies for Appointments Clause violations all warrant dismissal. The Court should therefore reverse the district court's remedial conclusion and remand with instructions to dismiss these four indictments.

### A. Standard of review

When the Court reviews a decision to dismiss (or not to dismiss) an indictment, "[a]ny legal issues predicating the district court's [order] receive de novo review." *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020). "[F]indings of fact are reviewed for clear error." *Id.*

(cleaned up). The Court reviews a district court's decision "under its supervisory powers for an abuse of discretion." *Id.*

## B. Dismissal is appropriate under the statutory framework.

The Court should order the indictments dismissed based on the FVRA.

When an invalid acting officer performs an action, there are two possible consequences. As explained above, Section 3348(d) imposes a ratification bar when the invalid acting officer performs an "exclusive, or nondelegable" function. *Gonzales*, 107 F.4th at 1074. The improper action "may not be ratified" later by a properly serving officer. 5 U.S.C. § 3348(d)(2). If an invalid acting officer performs a delegable function, the action is not "immediately lawful"—rather, it is unlawful—although a properly serving officer could hypothetically ratify the action later. *Gonzales*, 107 F.4th at 1077. Said differently, if an improper acting officer performs a nondelegable act, the act is "void"; if the act is delegable, the act is "voidable." *Id.* (cleaned up).

A core function of the U.S. Attorney is to authorize a decision to commence prosecution. Under 28 U.S.C. § 547, the U.S. Attorney

79

"shall—(1) prosecute all offenses against the United States" in the district. "The United States Attorney, within his/her district, has plenary authority with regard to federal criminal matters." U.S. Dep't of Just., Just. Manual § 9-2.001. "The authority is exercised under the supervision and direction of the Attorney General and his/her delegates." *Id.* The U.S. Attorney has a "statutory duty to prosecute for all offenses against the United States" and has "the broadest discretion in the exercise of such authority." *Id.* "The authority, discretionary power, and responsibilities of the United States Attorney with relation to criminal matters encompass," among other things, "[a]uthorizing prosecution." *Id.*

As the purported acting U.S. Attorney, Ms. Chattah had ultimate authority to decide whether to authorize the government to seek the indictments at issue here. Her decision to authorize these prosecutions—or her decision not to involve herself in the authorization process, *see* ER-179—is an invalid action under the FVRA that taints these prosecutions from the outset.

The statute provides remedies for invalid actions. Some of that analysis turns on whether authorizing a prosecution is a nondelegable

(versus a delegable) function. But however viewed, dismissal is appropriate.

If the U.S. Attorney's authority to authorize a prosecution is a nondelegable function, then the FVRA requires with-prejudice dismissal. That is so because the ratification bar would declare Ms. Chattah's authorization decision (or the lack thereof) void, and the ratification bar would further preclude a future properly serving U.S. Attorney from ratifying that decision by authorizing a new prosecution later. *See* 5 U.S.C. § 3348(d). If the case were dismissed without prejudice, and if a new U.S. Attorney gave approval to seek a new indictment, the approval would in effect ratify the prior authorization decision. Thus, if the decision to authorize prosecution is nondelegable, dismissal with prejudice would be necessary; no other remedy would respect the ratification bar. *Id.*

If the U.S. Attorney's authority to authorize a prosecution is a delegable function, then the FVRA still requires dismissal, albeit without prejudice. The ability to delegate this authority would mean only that a properly serving U.S. Attorney *could*, in theory, ratify the decision to commence prosecution later by securing a new indictment.

81

But no such ratification has occurred because there is no properly serving U.S. Attorney. Thus, at the present time, Ms. Chattah's authorization decision (or a lack thereof) is not "immediately lawful," and ratification "is not inevitable." *Gonzales*, 107 F.4th at 1077. Dismissal without prejudice would therefore be appropriate to cure the invalid filing while allowing a proper officer to ratify the decision later.

In declining dismissal, the district court did not address these statutory requirements. *See* ER-35. It instead observed that the Criminal Rules do not require the U.S. Attorney to sign an indictment. ER-35. But the defense's argument for dismissal in this section does not depend on a rules violation; instead, it relies on the FVRA and *Gonzales*. The district court also indicated this Court's decision in *Gantt* forecloses dismissal. ER-35-36. *Gantt* suggested that if an interim U.S. Attorney were invalidly appointed, the invalid appointment would not necessarily render an indictment defective because the Criminal Rules allow other attorneys to sign indictments. 194 F.3d at 998. That statement was not germane to the case's resolution and is therefore nonbinding dicta. *See, e.g.*, *Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244, 1248-54 (9th Cir. 2024) (en

82

banc) (Forrest, J., concurring) (discussing the nature of dicta). Regardless, the case is not on point because the defense is raising dismissal theories independent of the Criminal Rules that *Gantt* did not consider.

Regardless of whether the authority to authorize prosecution is nondelegable or delegable, the FVRA and *Gonzales* require dismissal, either with or without prejudice. The Criminal Rules do not override those statutory commands, so compliance with those rules is insufficient to justify the prosecutions.

### C.   Dismissal is appropriate under *Bundy*.

Separate from the statutory scheme, dismissal is also appropriate under this Court's decision in *Bundy*.

As *Bundy* explained, when the government engages in misconduct in a criminal case, federal courts retain authority to issue a suitable sanction. A remedy may be appropriate if the court "finds a serious due-process violation" or if the court concludes a sanction is necessary "under [the court's] inherent supervisory powers." 968 F.3d at 1030. If "the government's actions [are] sufficiently egregious," "dismissal with prejudice" is appropriate. *Id.*

83

Dismissal is necessary when the government violates due process in a manner "so grossly shocking and outrageous as to violate the universal sense of justice." *Bundy*, 968 F.3d at 1030 (cleaned up). Dismissal may also be necessary under the court's "inherent supervisory powers." *Id.* An exercise of inherent authority helps "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury" and "to deter future illegal conduct." *Id.* (cleaned up). The use of a remedy prevents the federal courts from "making themselves accomplices in willful disobedience of law." *Id.* (cleaned up). A supervisory sanction can be appropriate even if there is no due process violation. *See id.* Dismissal with prejudice under inherent authority is appropriate "only if there is (1) flagrant misbehavior and (2) substantial prejudice." *Id.* at 1031 (cleaned up).

Dismissal under *Bundy* is necessary because the government's conduct has created a serious due process violation. The Due Process Clause requires the prosecuting attorneys to be properly appointed. *See Erikson v. Pawnee Cnty. Bd. Of Cnty. Com'rs*, 263 F.3d 1151, 1154 (10th Cir. 2001) ("[T]he participation of a privately-retained attorney in a

84

state criminal prosecution does not violate the defendant's right to due process under federal law unless the private attorney effectively controlled critical prosecution decisions . . . includ[ing] whether to prosecute.") (cleaned up); *cf. Trump v. United States*, 603 U.S. 593, 643 (2024) (Thomas, J., concurring) (explaining that if a prosecutor lacks proper legal authorization, "then he cannot proceed with [a] prosecution" because "[a] private citizen cannot criminally prosecute anyone").[22] The defendants have a due process right not to be prosecuted by an office headed by an individual who is not validly serving in the position. Further, the existence of a potential Appointments Clause violation, as discussed above, underscores the due process analysis.

The district court disagreed that a due process violation has occurred. ER-36-37 & n.12. It noted the defense has no reason to believe Ms. Chattah is "partial," for example because she "has a

---

[22] *Cf.* 18 U.S.C. § 208(a) (criminalizing certain conflicts of interest); *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 808-09 & n.21 (1987) (imposing as a matter of "supervisory authority" a "requirement of a disinterested prosecutor," and declining to "reach[] any constitutional issues").

85

financial interest in their prosecutions." ER-37 n.12. But a defendant has a due process right to ensure the head prosecutor in the district is lawfully leading the office and eligible to make decisions regarding whether to authorize prosecutions. The district court did not fully engage with that point. It therefore erred as a matter of law when it declined to dismiss.

Even if no due process violation has occurred, the Court should still award dismissal under its inherent authority "to deter future illegal conduct" and "protect[] the integrity of the federal courts." *Bundy*, 968 F.3d at 1030. The administration's erroneous position creates multiple risks to the integrity of the federal courts and the federal government writ large. There are risks to the integrity of the four prosecutions at issue in this appeal. There are risks to the integrity of other prosecutions in the District of Nevada. There are risks to the integrity of prosecutions in multiple other districts. There are risks to "the statutory power of [district court] judges . . . to appoint an interim U.S. Attorney" under Section 546(d)—a power that has existed in near unbroken form since the Civil War. ER-10. There are risks to the Senate's constitutional advice and consent function. These

86

multiple risks require a robust remedy to sustain the integrity of the federal courts and the broader federal government and to deter future illegal acting officer appointments in other districts and agencies. Meanwhile, the defense has suffered substantial prejudice because Ms. Chattah's ineligibility equates to a structural error. Dismissal is therefore an appropriate remedy.

The district court distinguished *Bundy* because the case involved prosecutorial withholding of evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). ER-37. But nothing in *Bundy*—or the long line of cases predating *Bundy*—suggests the dismissal power is limited solely to *Brady* violations. The court also believed the "lesser remedy" of disqualification was suitable. ER-37. With respect, that remedy has not deterred the administration from continuing to defend its unlawful appointments, as well as making at least one post-decision retroactive designation in the Eastern District of Virginia. A stronger remedy is necessary. The district court therefore abused its discretion when it declined to dismiss.

### D. Dismissal is appropriate under *Lucia*.

When a litigant raises a valid challenge to an officer's status, the litigant is generally entitled to a suitable remedy. Here, that remedy is dismissal.

"[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief." *Lucia v. SEC*, 585 U.S. 237, 251 (2018) (cleaned up). In *Lucia*, an administrative law judge handled an SEC enforcement proceeding, but the Court found the ALJ was serving in violation of the Appointments Clause. Because the litigant made "a timely challenge" to the "validity of the appointment," some form of "relief" was appropriate. *Id.* The Court concluded "the appropriate remedy" was "a new hearing before a properly appointed official" who "cannot be" the ALJ who originally heard the case. *Id.* (cleaned up).

The district court in *Trump* applied *Lucia* to a scenario involving an invalidly serving special counsel who initiated a criminal prosecution, and it granted dismissal for the violation. As the court explained, *Lucia* "serves as the best comparator for remedy purposes." 740 F. Supp. 3d at 1303. "Here, as in *Lucia*, the appropriate remedy is

88

invalidation of the officer's *ultra vires* acts." *Id.* Because the special counsel was "exercising power that he did not lawfully possess . . . [a]ll actions that flowed from his defective appointment . . . were unlawful exercises of executive power." *Id.* (cleaned up). There was "no alternative course to cure the unconstitutional problem." *Id.*; *see also Trump*, 603 U.S. at 643 (Thomas, J., concurring) ("If there is no law establishing the office that the [prosecutor] occupies, then he cannot proceed with [the] prosecution. A private citizen cannot criminally prosecute anyone."); *Collins v. Yellen*, 594 U.S. 220, 277 (2021) (Gorsuch, J., concurring) (discussing similar cases).

Here, the defense raised timely challenges to Ms. Chattah's status as acting U.S. Attorney. The defendants are entitled to a suitable remedy, which should invalidate Ms. Chattah's ultra vires actions. Those actions include her decisions (or lack thereof) to authorize the four prosecutions. The indictments should therefore be dismissed.

The district court found this argument unpersuasive. It noted that in *Trump*, the special counsel signed the indictment, while in these cases, Ms. Chattah did not. ER-34. But regardless of signature, Ms. Chattah was invalidly leading the office when the government

89

obtained those indictments, and she had ultimate authority to decide whether to authorize the prosecutions. The district court also noted that in *Trump*, the government did not propose potential alternative remedies, while here, disqualification is a lesser remedy. ER-34. But regardless of whether lesser remedies exist, the question is what remedy will sufficiently invalidate Ms. Chattah's ultra vires actions. Disqualification is insufficient; the principles of *Lucia* and *Trump* require dismissal.

## Conclusion

This Court should affirm the district court's decision on the merits but reverse its decision on remedy and remand with instructions to dismiss the indictments.

Dated November 21, 2025.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Jeremy C. Baron*
Jeremy C. Baron
Assistant Federal Public Defender

*/s/ Sean A. McClelland*
Sean A. McClelland
Assistant Federal Public Defender

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-6214 & 25-6470; 25-6223 & 25-6475; 25-6224 & 25-6465; 25-6229 & 25-6468

I am the attorney or self-represented party.

**This brief contains** 16,497 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

◉ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Jeremy C. Baron **Date** 11/21/2025

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form15instructions.pdf](http://www.ca9.uscourts.gov/forms/form15instructions.pdf)

**9th Cir. Case Number(s)** | 25-6214 & 25-6470; 25-6223 & 25-6475; 25-6224 & 25-6465; 25-6229 & 25-6468

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

> Devonte Devon Jackson, Giann Icob Salazar Del Real, Jorge Enriquez, Jr., Shamar Tyrell Garcia.

**Description of Document(s)** *(required for all documents)*:

> Principal and Response Brief

**Signature** | s/ Jeremy C. Baron    **Date** | Nov 21, 2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

---

**Form 15**                                                      *Rev. 12/01/2018*